# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK, COMMERCIAL DIVISION**

QBE AMERICAS, INC., d/b/a QBE NORTH AMERICA,

Plaintiff,

vs.

KRISTINA ORCUTT, KRISTINA MULLIGAN, and APPLIED UNDERWRITERS, INC.,

Defendants.

Index No.

**SUMMONS**

To the above named Defendants:

     YOU ARE HEREBY SUMMONED to answer the Complaint in this action and to serve a copy of your Answer or, if the Complaint is not served with this Summons, to serve a Notice of Appearance on Counsel for Plaintiff within twenty (20) days after the service of this Summons, exclusive of the day of service (or within 30 days after service is complete if this Summons is not personally delivered to you within the State of New York). In the event of your failure to appear or answer, judgment shall be taken against you by default for the relief demanded in the Complaint.

Dated:  January 18, 2022
       Melville, New York

By: *David S. Greenhaus*
David S. Greenhaus
JACKSON LEWIS P.C.
Attorneys for Plaintiff
58 S. Service Road, Suite 250
Melville, New York 11747
(631) 247-0404

Defendant's last known address:

Kristina Orcutt
1265 N Layman St.
Gilbert, AZ 85233

4885-1965-4666, v. 1

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK, COMMERCIAL DIVISION**

| | |
|---|---|
| QBE AMERICAS, INC., d/b/a QBE NORTH AMERICA, | Index No. |
| Plaintiff, | **SUMMONS** |
| vs. | |
| KRISTINA ORCUTT, KRISTINA MULLIGAN, and APPLIED UNDERWRITERS, INC., | |
| Defendants. | |

To the above named Defendants:

      YOU ARE HEREBY SUMMONED to answer the Complaint in this action and to serve a copy of your Answer or, if the Complaint is not served with this Summons, to serve a Notice of Appearance on Counsel for Plaintiff within twenty (20) days after the service of this Summons, exclusive of the day of service (or within 30 days after service is complete if this Summons is not personally delivered to you within the State of New York). In the event of your failure to appear or answer, judgment shall be taken against you by default for the relief demanded in the Complaint.

Dated:  January 18, 2022
        Melville, New York

By: *David S. Greenhaus*
David S. Greenhaus
JACKSON LEWIS P.C.
Attorneys for Plaintiff
58 S. Service Road, Suite 250
Melville, New York 11747
(631) 247-0404

Defendant's last known address:

Kristina Mulligan
860 Brookfield Pkwy
Roswell, GA 30075

4864-8974-2602, v. 1

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK, COMMERCIAL DIVISION**

| | |
|---|---|
| QBE AMERICAS, INC., d/b/a QBE NORTH AMERICA, | Index No. |
| Plaintiff, | **SUMMONS** |
| vs. | |
| KRISTINA ORCUTT, KRISTINA MULLIGAN, and APPLIED UNDERWRITERS, INC., | |
| Defendants. | |

To the above named Defendants:

YOU ARE HEREBY SUMMONED to answer the Complaint in this action and to serve a copy of your Answer or, if the Complaint is not served with this Summons, to serve a Notice of Appearance on Counsel for Plaintiff within twenty (20) days after the service of this Summons, exclusive of the day of service (or within 30 days after service is complete if this Summons is not personally delivered to you within the State of New York). In the event of your failure to appear or answer, judgment shall be taken against you by default for the relief demanded in the Complaint.

Dated: January 18, 2022
      Melville, New York

By: *David S. Greenhaus*
David S. Greenhaus
JACKSON LEWIS P.C.
Attorneys for Plaintiff
58 S. Service Road, Suite 250
Melville, New York 11747
(631) 247-0404

Defendant's last known address:

Jeffrey A. Silver
Applied Underwriting, Inc.
Secretary and General Counsel
1120 6th Ave
New York, NY 10036

4892-9954-7145, v. 1

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK, COMMERCIAL DIVISION**

| | |
|---|---|
| QBE AMERICAS, INC., d/b/a QBE NORTH AMERICA, | Index No. |
| Plaintiff, | **COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES** |
| vs. | |
| KRISTINA ORCUTT, KRISTINA MULLIGAN, and APPLIED UNDERWRITERS, INC., | |
| Defendants. | |

QBE Americas, Inc., d/b/a QBE North America ("QBE" or "Petitioner"), by its undersigned counsel, Jackson Lewis P.C., for its Complaint for Injunctive Relief and Damages against Defendants Kristina Orcutt ("Orcutt"), Kristina Mulligan ("Mulligan"), and Applied Underwriters, Inc. ("Applied" or "Applied Underwriters") (collectively, "Defendants") on its claims against Orcutt and Mulligan for breach of the duty of loyalty, against Applied for tortious interference with the contracts of two QBE executives, and against all Defendants for misappropriation of confidential information, and unfair competition.

**OVERVIEW**

1.      This case involves the abrupt and coordinated resignation on September 20, 2021 of thirteen individuals (including Senior Underwriters Orcutt and Mulligan) who comprised about one third of QBE's Aviation insurance division. The group left to start Applied's new aviation insurance group. Several of these former employees, including Orcutt and Mulligan, egregiously violated their confidentiality obligations *while still employed at QBE* in order to misappropriate QBE confidential information to gain an unfair advantage against QBE in competing with it and soliciting its policyholders. Further, two of the former

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

employees—QBE SVP and Head of Aviation Steven Allen ("Allen") and QBE Vice President, Aviation Underwriting Gregory Dekker ("Dekker")—were subject to written employment agreements with QBE. Applied induced Allen and Dekker to breach their contractual obligations (including notice, confidentiality, and non-solicitation obligations) as part of a scheme orchestrated by Allen, Dekker, and Applied to unfairly compete with QBE.

2.     QBE's claims against Allen and Dekker, which arise out of the same facts and circumstances set forth herein, are subject to arbitration pursuant to their employment agreements. In coordination with this Complaint, QBE has filed with this Court a related Petition for Injunctive Relief in Aid of Arbitration against Allen and Dekker, seeking a temporary restraining order and preliminary injunctive relief in aid of arbitration.

3.     At least three of those thirteen departed employees including Allen, Orcutt, and Mulligan, in the weeks leading up to their resignations (and immediately following a meeting between Allen and their new employer, Applied), emailed several documents containing QBE's confidential information to their personal email addresses.

4.     Orcutt and Mulligan acted at the direction of, and/or with the blessing of, Allen, Dekker, and/or their new employer, Applied.

5.     By their actions, Orcutt and Mulligan each breached their confidentiality obligations and duty of loyalty to QBE.

6.     Applied has tortiously interfered with QBE's employment agreements with Allen and Dekker, and stands to benefit from Allen's and Dekker's breaches of contract, as well as Allen's, Orcutt's, and Mulligan's misappropriation of QBE's confidential information.

7.     To prevent continued irreparable harm to QBE, QBE seeks immediate injunctive relief in the form of a temporary restraining order and a preliminary injunction

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

enforcing Orcutt's and Mulligan's confidentiality obligations to QBE, and enjoining Applied from interfering further with the April 9, 2016 Employment Agreement between Allen and QBE, and the May 9, 2016 Employment Agreement between Dekker and QBE. Specifically, QBE seeks to: enjoin Orcutt and Mulligan from breaching their confidentiality commitments to QBE; enjoin Orcutt and Mulligan from breaching their fiduciary obligations to QBE; enjoin Applied from tortiously interfering with Allen's and Dekker's contractual obligations; enjoin all Defendants from using and disclosing QBE's confidential information and trade secrets in breach of their common-law duties and to engage in unfair competition; and obtain expedited discovery regarding Defendants' unlawful activities.

## **<u>PARTIES</u>**

8.    Plaintiff QBE is a Delaware corporation, with its principal place of business at 55 Water Street, New York, NY 10041.

9.    QBE is a global insurance company that provides its customers with, among other things, specialty insurance policies. One of QBE's specialty insurance divisions is Aviation, which provides clients nationwide - who own or lease aircraft and/or provide products or services to the aviation industry - with competitive and flexible insurance underwriting by a seasoned team of underwriters with real world aviation experience that delivers affordable, comprehensive aviation insurance coverage.

10.   Defendant Orcutt is an individual who resides in Gilbert, Arizona.

11.   Defendant Mulligan is an individual who resides in  Roswell, Georgia.

12.   Defendant Applied is a national insurance company, incorporated in Delaware and with its principal place of business in New York.

13.   Applied is a direct competitor of QBE.

3

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## JURISDICTION AND VENUE

14.     This Court may exercise personal jurisdiction over Defendants pursuant to New York CPLR §§ 301 and 302.

15.     Venue is proper in New York County because, among other things, QBE maintains its principal place of business in New York, New York, Applied maintains its principal place of business in New York, New York, and "a substantial part of the events or omissions giving rise to the claim occurred" in New York, New York.

## ALLEN'S, DEKKER'S, ORCUTT'S, AND MULLIGAN'S OBLIGATIONS TO QBE

16.     Allen began his employment with QBE in July 2015 as a Vice President, and was promoted in April 2016 to Senior Vice President, General Aviation at QBE, tasked with leading QBE's Aviation division. He was directly responsible for the performance of QBE's Aviation division, and overseeing all its personnel.

17.     Dekker began his employment with QBE in May 2016. He held the title of Vice President, Aviation Underwriting at QBE, tasked with overseeing the Aviation division's underwriters. Dekker reported to Allen.

18.     Allen and Dekker were well-compensated by QBE. In 2021 Allen earned approximately $350,000 in gross compensation, and Dekker earned Approximately $270,000 in gross compensation. QBE also paid Allen's and Dekker's travel, entertainment and other expenses which were used to create, facilitate and expand relationships with brokers and QBE policyholders.

19.     Orcutt began her employment with QBE in April 2017.

20.     Mulligan began her employment with QBE in September 2012.

21.     Orcutt and Mulligan were both Senior Underwriters in the Aviation division, reporting indirectly to Allen.

4

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

22. As trusted employees of QBE, Allen and Dekker were provided access to and gained knowledge of confidential information and trade secrets belonging to QBE regarding its business, including but not limited to policyholder lists, business summaries, business strategy, market analyses, employee compensation information, policyholder claims data, and pricing/rate data.

23. Such confidential information and trade secrets are of significant economic value to QBE, and would be of significant economic value to QBE's competitors, including Applied.

24. QBE goes to great lengths to protect its confidential information and trade secrets, such as promulgating and disseminating policies to its employees that prohibit the use or disclosure of QBE's confidential information and trade secrets for non-business purposes, requiring employees who have access to such confidential information and trade secrets to sign agreements that restrict their use or disclosure of QBE's confidential information and trade secrets and restrict certain post-employment activities, requiring employees to complete security awareness training modules regarding the importance of, and means by which, to protect QBE's confidential information, and password-protecting and otherwise limiting individual access to computers and systems containing QBE's confidential information and trade secrets.

25. Allen entered into a written employment agreement with QBE upon his promotion to SVP in April 2016, and Dekker entered into a written employment agreement upon the commencement of his employment in May 2016. The Employment Agreements are identical apart from title and compensation. Copies of the Employment Agreements are attached hereto as Exhibits "A" (Allen's Agreement) and "B" (Dekker's Agreement).

26. Under the "Employee Covenants" section of the Employment

5

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Agreements, in 6(a), Allen and Dekker agreed to hold all of QBE's Confidential Information in a fiduciary capacity and to safeguard it for the benefit of QBE. They further agreed not to directly or indirectly use or disclose QBE's Confidential Information without its prior written consent except to perform their duties to QBE. They also agreed not to disclose any printed or electronic documents containing QBE's Confidential Information to anyone outside QBE's organization or use them for any purpose other than the advancement of QBE's interests. Finally, they agreed to return all printed or electronic documents (including copies) containing QBE's Confidential Information to QBE's.

27.    Under the "Broker, Agent, and Policyholder Non-solicitation" section of the Employment Agreements, in paragraph 6(c), Allen and Dekker agreed to the follow 12-month non-solicit obligation:

> The Employee agrees that during the Employee's employment with the Company and for 12 months following a termination of employment that occurs for any reason, the Employee will not solicit any broker, agent or policyholder of the Company on behalf of the Employee or any other person, firm, company, or organization, either directly or indirectly, for the purpose of soliciting or obtaining insurance business or any account that was business or an account of the Company's during the 12 months prior to the Employee's termination of employment from the Company. The Employee further agrees that during the Employee's employment with the Company and for 12 months following a termination of employment that occurs for any reason, the Employee shall not contact any broker, agent or policyholder of the Company to discourage such entity or individual from doing business with Company, nor accept any business or account from any broker, agent, or policyholder that was business or an account of Company's during the 12 months prior to the Employee's termination of employment from the Company. For the avoidance of doubt, nothing in this paragraph shall be construed to prohibit Employee from soliciting any broker, agent, or policyholder for insurance business or accounts that were not Company business or accounts in the 12 months prior to the Employee's termination of employment from the Company.

28.    Under the "Employee Non-solicitation" section of the Employment

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

Agreements, in paragraph 6(d), Allen and Dekker each agreed to the following twelve-month

non-solicitation obligation:

> The Employee agrees that during the Employee's employment with the Company and for 12 months following a termination of employment that occurs for any reason, the Employee will not:
>
> > i.    recruit, hire, or attempt to recruit or hire, directly or by assisting others, any then- current employee of the Company for employment with an entity other than the Company; or
> >
> > ii.    entice or attempt to persuade the Company's then-current employees to leave employment with the Company.
>
> For purposes of this Section 6, "solicit" means any direct or indirect communication of any kind, regardless of who initiates it, that in any way invites, advises, encourages or requests any person to take or refrain from taking any action..

29.    Under the "Restrictive Covenants" section of the Employment

Agreements, in paragraph 7, Allen and Dekker each agreed to the following 90-day notice

obligation regarding termination of their employment with QBE: "[t]he Employee may terminate

this Agreement and his employment by providing at least 90 days' advance notice to the

Company."

30.    Under the "Miscellaneous" section of the Employment Agreements, in

paragraph 7(i), Allen and Dekker each agreed to the following arbitration provision:

> Any dispute or controversy arising under or in connection with this Agreement shall be settled exclusively by arbitration, conducted before a single arbitrator in the state of New York in accordance with the rules of the American Arbitration Association then in effect. An arbitrator cannot award any amount to the Employee greater than the Employee would have otherwise received under this Agreement. The Company shall pay all the costs and expenses of any such arbitration proceeding, and the parties shall each pay their own attorneys' fees and expenses. Notwithstanding the foregoing, either party hereto may petition any state or federal court having jurisdiction to provide equitable relief to enjoin or prohibit ongoing and irreparable injury to the petitioning party due to any violation of this Agreement, including but not limited to a

7

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

violation of Section 6 of this Agreement.

31.    In addition to the obligations Allen and Dekker agreed to in their respective employment agreements, as senior employees of QBE, Allen and Dekker (along with Orcutt and Mulligan) also agreed to be bound by, honor, and be exemplars for QBE's Code of Ethics and Conduct.

32.    QBE Code of Ethics and Conduct provides, in relevant part, that "Confidential information includes non-public financial, corporate and personal information. It incorporates technical information about products or processes, vendor lists, pricing, marketing or service strategies, non-public financial reports, and information on asset sales, mergers and acquisitions." Moreover, it states that employees "will have access to confidential information in the course of [their] employment and must protect it and manage it responsibly. [Employees] must never use it for personal advantage."

33.    Allen, Dekker, Orcutt and Mulligan completed training modules regarding the Code of Ethics and Conduct.

34.    Allen, Dekker, Orcutt and Mulligan also received and reviewed QBE's employee handbook upon their respective hires, which contains a section titled "Confidentiality of Information About Company, Insureds, Co-Workers," which provides that "All employees are required to maintain the confidentiality of confidential information that they receive during the course of their employment whether related to the company, insureds, claimants or co-workers. For more information about employees' obligations, review the Corporate Security Information policy and Confidentiality sections of the Group Code of Ethics and Conduct."

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 1

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 01/18/2022

Case 1:22-cv-00757-JSR   Document 19-1   Filed 02/11/22   Page 13 of 49

## ALLEN'S, DEKKER'S, ORCUTT'S AND MULLIGAN'S VOLUNTARY RESIGNATION FROM EMPLOYMENT  WITH QBE AND THEIR SUBSEQUENT EMPLOYMENT WITH APPLIED

35.     On the morning of September 20, 2021,[1]/ Allen called his manager, Steven Gransbury, QBE's Head of Specialty Insurance, to inform Mr. Gransbury that (to Allen's purported shock) 12 individuals on his Aviation team (including a QBE employee who solely supported Aviation, in Underwriting Operations) had resigned:

- Greg Dekker – Vice President, Underwriting (New York, NY)[2]/
- Brian Neal – Vice President, Underwriting (Atlanta, GA)
- David Gray – Vice President, Underwriting (Atlanta, GA)
- Peter Guy – Vice President, Claims (Atlanta, GA)
- William Harwell – Vice President, Underwriting (Atlanta, GA)
- Scott Stewart – Assistant Vice President, Underwriting (Atlanta, GA)
- Kristina Mulligan – Senior Underwriter (Atlanta, GA)
- Kristina Orcutt – Senior Underwriter (Arizona)
- Josh Wilcoxon – Aviation Claims Manager (Atlanta, GA)
- Portia Butsko – Senior Claims Specialist (Atlanta, GA)
- Jennifer Reynolds - Senior Underwriter (Atlanta, GA)
- Donna D'Oria – Underwriter Operations (New York, NY)

36.     During that conversation Allen also told Mr. Gransbury that none of those individuals had informed Allen where they were going to be employed upon leaving QBE.  Allen also said that he was unaware if they were all moving to a new employer together, and he was not involved in their collective decision to resign their employment with QBE. Allen suggested to Mr. Gransbury that they could all be moving on to different opportunities and different employers.

37.     Later in the day, Allen contacted QBE's human resources department and said that he was considering "_retiring_" given the wave of resignations in Aviation. Mr.

---

[1]/     All dates referenced herein are from 2021, unless otherwise indicated.
[2]/     The parentheticals in this list note the QBE office in which the employee worked.

9

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Gransbury spoke to Allen soon thereafter and told him that whether he chose to retire was his prerogative. Mr. Gransbury reminded Mr. Allen of his 90-day notice obligation.

38.     Also on September 20, Allen sent an email to the entire Aviation division informing the group he was resigning. Mr. Gransbury learned about the email, and then called Allen, who informed Mr. Gransbury directly that he was resigning. Mr. Gransbury again reminded Allen of his employment obligations and that QBE wanted his assistance in the aftermath of the mass departure.

39.     On or about September 22, Allen spoke with both Todd Jones (QBE's CEO) and Andrew Horton (QBE Insurance Group Limited's CEO) regarding his decision to resign.

40.     Allen subsequently emailed QBE human resources on September 22 informing HR that he had spoken to Mr. Jones and Mr. Horton about how QBE leadership's response to this crisis disenchanted him and led to his "breaking point" and decision to resign. The leadership response to which Allen appears to have alluded involved QBE leadership's desire to understand the scope and reason behind the mass departure, determine whether any misconduct had occurred, and appropriately address the mass departure.

41.     On September 23, Jacklyn Thies, QBE's Associate General Counsel, sent identical letters to both Allen and Dekker, reminding them of their continuing contractual obligations to QBE, including their 90-day notice period and employee/policyholder non-solicitation obligations. She attached their respective employment agreement to each letter. She also informed each of them that their last date of employment with QBE would be December 19, although they might be placed on non-working status (i.e. "garden leave") before that point.

42.     In the weeks that followed, Allen did not respond to QBE employees'

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

requests for information aimed at locating files and assisting with the transition of the Aviation division to new leadership.

43.     Dekker was initially responsive and cooperative with offering transition assistance, but he too ceased responding well before the last day of his notice period and employment with QBE (December 19).

44.     QBE terminated Allen's and Dekker's access to its network and systems (including email and Aviation-related document systems) on October 1.

45.     On October 27, Allen's attorney, Steven Mintz, Esq., called Jacklyn Thies regarding her letter to Allen and maintained that Allen no longer considered himself an employee of QBE (notwithstanding his 90-day notice provision) as of October 1.

46.     Ms. Thies expressed that QBE disagreed with Allen's position. Mr. Mintz suggested this dispute could potentially be resolved if Allen could, on behalf of Applied Underwriting, enter into a renewal rights deal for the entire aviation book of business from QBE, and for the first time QBE became aware of Allen's apparent connection with Applied, but the short discussion was not productive.

47.     Mr. Mintz followed up the conversation with an October 28 letter which, among other things, stated that Allen no longer considered himself an employee of QBE as of October 1.

## QBE LATER LEARNS OF ALLEN'S, DEKKER'S, ORCUTT'S AND MULLIGAN'S UNLAWFUL ACTIVITES

48.     Beginning in and around November 2021, after learning Allen was in league with Applied, QBE began reviewing and investigating Allen's and the other departed employees' emails and files connected to the suspicious nature of the sudden and mass departure

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1    Case 1:22-cv-00757-JSR    Document 19-1    Filed 02/11/22    Page 16 of 49    RECEIVED NYSCEF: 01/18/2022

of 11 employees in the Aviation division (and 1 employee who supported the group), followed by Allen's allegedly unconnected resignation.

49.    QBE discovered that Allen had—in breach of his employee non-solicitation obligations and his duty of loyalty—orchestrated a poaching scheme in coordination with his new employer, Applied.

50.    While still employed with QBE, for example, Allen travelled from Atlanta to New York and met with one or more representatives of Applied, in person, at least twice in the three months prior to his departure. Allen attended those clandestine meetings armed with (i) documents he created containing QBE's confidential information; and (ii) a two-phased target list of QBE employees in the Aviation division whom he intended to poach from QBE (along with the revenue each employee had generated for QBE) to form his new aviation group at Applied. Every employee that Allen included in "phase one" of his raiding scheme subsequently resigned their employment with QBE on September 20 and then joined Applied.

51.    On June 23, Allen emailed himself (from his QBE email to his QBE email) a Microsoft Word document entitled "RIV" which, according to its metadata, was created on June 22nd at 2:34 PM, authored by Allen, and last modified on June 22nd at 3:56 PM by Allen. The document contains an outline for a "Meeting with Jamie Sahara (RIV Partners); 6/23/21," which is the text written in the first line of the document.

52.    According to Applied Underwriters' website, Jamie Sahara is the President of Applied Underwriters. According to Rivington Partners' website, Mr. Sahara is also the founder and Chief Executive Officer of Rivington Partners, another insurance company.

12

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

53.     The first section of the "RIV" document contains financial metrics of QBE's Aviation division, noting that the business grew about 150% in 5 years , and consisted of a team of 36, including 30 underwriters and 6 in claims.

54.     The second section of the document is titled "Questions" and contains, in an outline format, items including "Team makeup, #, salary, equity," "Internal Support," "Which segments in Aviation?" "Timing?" and "Home office v Commercial location."

55.     The third section contains information about a "Team," broken into three sub-sections: "minimal (8)," "optimal (12)," and "Phase II (16)."

56.     The "minimal (8)" section in the "RIV" document names and describes eight QBE employees who worked in the Aviation division, including Steve Allen, David Gray, William Harwell, Greg Dekker, Donna D'Oria, Peter Guy, and Josh Wilcoxon, and includes monetary figures adjacent to 4 of the employees' names.

57.     The section also states the group of 8 employees represents an eight-figure sum "in 2020 GWP; focus on IA, GA, APL, Specialty, Pax/Cargo." "IA, GA, APL, Specialty, Pax/Cargo" are acronyms for different segments of Commercial and General Aviation insurance (i.e. Industrial Aid, General Aviation, Aviation Products Liability, Specialty and Limited Passenger/Cargo), which were the lines of business that those 8 named employees focused on within QBE's Aviation division.

58.     The "optimal" section in the "RIV" document names and describes the same eight employees listed in the preceding section, and names 4 additional QBE employees: Kristina Mulligan, Brian Neal, Jen Reynolds, and Portia Butsko. The section also states the group of 12 employees represents a nine-figure sum in 2020 GWP, brings in AWC." AWC is an

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

acronym for Aviation Workers Compensation insurance, which was Brian Neal's area of specialization.

59.     ***All the above-named employees*** included in Allen's document resigned from QBE on the morning of September 20.

60.     The "Phase II" section includes 4 additional names of QBE Aviation employees, including Kristina Orcutt (who has a monetary figure adjacent to her name). The section also states the group of 16 employees represents a nine figure sum "in 2020 GWP, brings in Airports and additional IA, GA." Airports, Industrial Aid (IA) and General Aviation (GA) were the lines of business that those 4 additional employees focused on for QBE's Aviation division.

61.     Three employees named in the Phase II section remain employees of QBE, while Kristina Orcutt is among the group that resigned on September 20.

62.     The document entitled "RIV" contains confidential information concerning the QBE Aviation division's performance, as well as the makeup and revenue generated by its workforce.

63.     Allen's expense reports and the billing statements for his QBE corporate credit card establish that he traveled from Atlanta to New York City in and around June 23, to meet with Applied. Allen received reimbursement for several charges he incurred during the trip, but had misrepresented where and why those charges had been incurred.

64.     According to Applied Underwriters' website, it is headquartered and maintains offices in New York City (at 1120 6th Ave, New York, NY 10036). There is no legitimate QBE-related business reason for Allen to have travelled to New York in or around June 23.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

65.     QBE policy at the time required all employees to receive approval for air travel from their manager. Allen was not approved to travel for this period (to New York or anywhere else).

66.     Allen's expense reports and the billing statements for his QBE corporate credit card also establish that he traveled from Atlanta to New York City in and around August 12, to meet with Applied again. Allen also received reimbursement for several charges he incurred during this second trip, including a first-class airfare upgrade, and again misrepresented where and why those charges had been incurred. There is no QBE business-related reason for Allen to have travelled to New York from in or around August 12. Allen was not approved to travel for this period (to New York or anywhere else).

67.     On August 11, Allen sent an email from his QBE email account to his personal Hotmail email account with several attachments, including a Microsoft Word document titled "Applied" which, according to its metadata, was created on August 9th at 12:00 PM, authored by Allen, and last modified on August 9 at 3:19 PM by Allen. The document contains an outline for a "Meeting with Applied on 8.12.21," which is the text written in the first line.

68.     The email Allen sent to his personal email account on August 11 also included the following attachments:

- a presentation converted into a .pdf document named "Aviation 2021 June Results Deck;"
- a Microsoft PowerPoint presentation named "Aviation Cell Review April 2021 v9;"
- a Microsoft PowerPoint presentation named "Aviation Performance Review DRAFT v2;"
- a Microsoft Word document named "Cell Review talking points 012021 v2;" and
- a pdf of an article from "Insurance Journal" named "In His Own Words_Q&A with Applied Underwriters' Menzies on Buffet, California and 'Pumping Entrepreneurial Power."

15

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

69.     The documents attached to Allen's email, aside from the Insurance Journal article, are confidential QBE documents containing financial and performance metrics detailing 2021 year-to-date profits and losses for the QBE Aviation division, market trend analyses, outlooks for 2021 and beyond, and QBE Aviation's strategic business goals. There is no legitimate QBE-related business reason for Allen to have sent these materials to his personal email address on or around August 11.

70.     The "Applied" document that Allen authored (which states in the first line: "Meeting with Applied on 8.12.21") contains three sections.

71.     The first section sets forth a three-page detailed performance and financial history of the QBE Aviation division from 2011 to 2021, including screenshots of slides from confidential internal QBE presentations containing aviation insurance market and competitor analysis, business development strategy and threat analysis, and forecasts through 2023.

72.     The second section, titled "Details" begins with: "1. Proposed team composition (12) – Allen, Gray, Guy, Harwell, Dekker, Stewart, Mulligan, Wilcoxon, Butsko, Neal, Reynolds and D'Oria." The remainder of the "Details" section outlines various topics regarding how an aviation insurance division would operate (e.g., "Compensation – base + Commission + distribution," "Paper – Applied Underwriting (A rating)," "Does Applied have filed 'following form' so we can immediately bind coinsurance business?").

73.     The third section, titled "Team," is identical to the "optimal" and "Phase II" sections which were included in the "RIV" document that had been authored by Allen in June 2021.

74.     On August 12 at 9:36 PM, the same day as Allen's "Meeting with Applied," Orcutt emailed 18 files containing QBE confidential information from her QBE email

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

to her personal Gmail email account. These files, including Microsoft Excel spreadsheets and Microsoft Word documents are titled:

- Tracking Sheet - Policies Bound - WINS CLOSE 2021.xlsx;
- Tracking Sheet - Policies Bound - WINS CLOSE 2020.xlsx;
- Tracking Sheet - Policies Bound - WINS CLOSE 2019.xlsx;
- Tracking Sheet - Policies Bound - WINS CLOSE 2018.xlsx;
- 01 - PB Rating Worksheet with Cover Sheet.xls;
- 01 - Products_Quote_Sheet.xls;
- 01 - Commercial Worksheet (AC & GL).xlsx;
- 01 - IA Rating Worksheet with Cover Sheet.xls;
- commissions.xlsx;
- rating issues.docx;
- Q- RATING ISSUES (003).docx;
- Sample Purpose of Use Wordings.docx;
- Final Pilot Wording.docx;
- 2021-22 Underwriting Pricing Rationale Template.docx;
- 2021 Final No-Go decline list.xlsx;
- 2020 UW PRINCIPLES.docx;
- SF HANDOFF SHEET - REV 07-09-21.xlsx; and
- Sample Pilot Wordings.docx

75.     Three minutes later, on August 12 at 9:39 PM, Orcutt sent a second email from her QBE email to her personal email, this time attaching additional files containing QBE confidential information. These files, including Microsoft Excel spreadsheets and Microsoft Word documents are titled:

- 021 Final No-Go decline list.xlsx;
- 2020 UW PRINCIPLES.docx;
- Sample Pilot Wordings.docx;
- Sample Purpose of Use Wordings.docx;
- Final Pilot Wording.docx;
- 2021-22 Underwriting Pricing Rationale Template.docx; and

76.     The QBE confidential documents Orcutt copied and transmitted from QBE's secure systems on August 12 contain, among other things, information about QBE policyholders (including current, expiring, and renewal rates), broker contacts and commissions rates, sample policy wording, and an internal QBE memo marked "private and confidential" that

17

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1    Case 1:22-cv-00757-JSR    Document 19-1    Filed 02/11/22    Page 22 of 49    RECEIVED NYSCEF: 01/18/2022

contains "best practices" for aviation insurance underwriting. Orcutt effectively emailed herself an aviation underwriting "starter kit." There is no legitimate QBE-business related reason for Orcutt to have sent these materials to her personal email address on or around August 12.

77.    Also on August 12, at 9:45 PM, Orcutt emailed, from her QBE email address to her personal email address, information concerning her QBE 401k plan. Upon information and belief, prior to sending any of the August 12 emails, Orcutt had been informed by Allen, Dekker, and/or Applied that Allen was planning on poaching a team to start Applied's aviation insurance group, and Orcutt (as an employee would typically do upon contemplating or in advance of departure) sent herself the 401k information so that she would have access to it after leaving QBE.

78.    Upon information and belief, Orcutt misappropriated QBE confidential documents for the purpose of using the information contained therein in her new job with Applied, and did so at the direction of, and/or with the blessing of Allen, Dekker, and/or Applied.

79.    On August 13, the day after Allen's "Meeting with Applied," Kristina Mulligan, a Senior Underwriter in QBE's Aviation division and one of the employees who resigned on September 20, emailed a Microsoft excel spreadsheet containing QBE confidential information from her QBE email to her personal Gmail email account. This file is titled "2021 ATL Branch Log updated alt.xlsx" and contains confidential information of QBE's aviation insurance policyholders, including both new and renewal business, premium rates, and notes regarding the accounts. There is no legitimate QBE-business related reason for Mulligan to have sent this file to her personal email address on or around August 13.

18

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

80.     Upon information and belief, Mulligan misappropriated a confidential QBE document for the purpose of using the information contained therein in her new job with Applied, and did so at the direction of, and/or with the blessing of Allen, Dekker, and/or Applied.

81.     On August 17, Allen sent an email from his QBE email account to his personal Hotmail email account with several .pdf attachment named as follows:

- APPENDIX 1 – AVIATION DOCUMENT CHECKLIST 2020;
- Appendix 2 – Corporate UW Manual 2021;
- APPENDIX 3 – ImageRight Handbook v4; and
- AVIATION UND,ERWRITING RULES AND GUIDELINES effective July 2021 FINAL.

82.     The documents attached to Allen's email are confidential QBE documents containing proprietary manuals and business methods developed and created by QBE's Aviation team. There is no legitimate QBE-business related reason for Allen to have sent these materials to his personal email address on or around August 17.

83.     Upon information and belief, Allen, Dekker, Orcutt, Mulligan, and the other former QBE employees are using the misappropriated QBE manuals and business methods to jump-start Applied's new aviation insurance group and unfairly compete with QBE.

84.     On August 26, Allen emailed QBE's Vice President of HR inquiring about how QBE treats bonuses for departing employees, under the guise of asking about a recently departed employee. Allen believed that QBE should offer pro-rated bonuses to departing employees, notwithstanding that HR informed him that employees who resign are ineligible for bonuses. Upon information and belief, Allen was surreptitiously inquiring whether or not he could assure the dozen employees he was poaching to join him at Applied, including Dekker,

19

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Orcutt, and Mulligan, that they would receive pro-rated bonuses from QBE notwithstanding their resigning 4 months prior to the end of the year.

85.     According to the website of the Department of State of the State of Delaware, Applied Underwriters Aviation, LLC was incorporated in the State of Delaware on September 9.

86.     Upon information and belief, on or before September 20, Applied extended offers of employment to Allen, Dekker, and the other QBE employees who resigned on September 20.

87.     On September 24, Peter Guy, QBE's Vice President, Claims Leader for the Aviation Division emailed Senior Claims Specialist Portia Butsko attaching a list he had authored that day, of over a dozen insurer and broker contacts (containing names and email addresses) operating in the aviation coinsurance business, asking Butsko if she could "think of any others? Insurers or brokers." Both Guy and Butsko had provided QBE, on September 20, with two weeks' notice of their intent to resign from QBE. Upon information and belief, Guy had acquired the contact names and email addresses from confidential QBE documents. There is no legitimate QBE-business related reason for Guy to have created this list and inquired about such contacts with Butsko on September 24.

88.     Upon information and belief, Guy and Butsko misappropriated confidential QBE information for the purpose of using the information in their new jobs with Applied for the benefit of Applied's new aviation insurance group, and did so at the direction of, and/or with the blessing of Allen, Dekker, and/or Applied.

89.     Upon information and belief, Applied was aware of the Employment Agreements, and Allen's and Dekker's obligations contained therein, including their 90-day

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

notice period and non-solicitation provisions, when it hired Allen, Dekker, and the other QBE employees in or about September 2021.

90.    Upon information and belief, Applied was aware of Allen's non-solicitation obligations when it met with him on at least two occasions prior to September 20, and discussed the QBE employees and business Allen intended to target and steal from QBE. Applied approved Allen's direct targeting and solicitation of QBE's workforce, and/or indirectly facilitated Allen's scheme by recruiting and hiring the 12 QBE employees that Allen had identified for Applied.

91.    Upon information and belief, given Allen's pitch to Applied during his clandestine meetings involved highlighting the revenue generating capability of the dozen poached QBE employees (earned through their business with QBE policyholders), Applied hired Allen, Dekker, Orcutt, Mulligan, and the other QBE employees because it intended for the new Applied aviation insurance group to target QBE's policyholders, misuse QBE's confidential information, and unfairly compete to steal QBE's business.

92.    Upon information and belief, Applied was also aware Allen and other QBE employees had misappropriated QBE's confidential information and trade secrets in order to jump start the Applied aviation group and provide it with an unfair competitive advantage over QBE.

93.    On or about December 2, David Watkins (the current QBE SVP, Head of Aviation) learned from a broker that Dekker had been soliciting the business of a QBE Aviation policyholder on behalf of Applied Underwriting. Dekker had emailed a brokerage company from an Applied Underwriters email address regarding proposed terms for an aviation insurance policy for a QBE policyholder whose policy with QBE was soon expiring and coming up for

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

renewal. Dekker—who knew the specific terms of the QBE policyholders' expiring policy, and that QBE would have proposed a rate increase for its renewal terms—attempted to undercut the renewal terms that QBE had quoted its policyholder.

94.    Through the operation of his Employment Agreement, Dekker remained an employee of QBE on December 2; while he was not actively performing work for QBE during the notice period, he continued to receive compensation and benefits through December 19.

95.    On December 6, Kathryn Rouker (QBE VP, Aviation Underwriting) participated in a virtual renewal meeting held and hosted by a broker for the purpose of providing prospective insurance carriers with the opportunity to learn about several insureds' aviation businesses and any changes thereto. She had been invited to join the meeting because some participating insureds were QBE policyholders. Several insurance carriers and insureds with aviation businesses attended the meeting.

96.    Ms. Rouker observed Dekker join and participate in this virtual renewal meeting, including by asking questions of other participants. Through the operation of his Employment Agreement, Dekker remained an employee QBE as of December 6, although he was not actively performing work for QBE.  There was no legitimate QBE-related business reason for Dekker to participate in that virtual meeting.

97.    On or about December 14, Dekker sent an email to a broker with and through whom QBE conducts business, in which Dekker attached a contact list of Applied Underwriters Aviation named "11-01-21 Contact Sheet." The broker forwarded the email and its attachments to David Watkins. The contact list contained the following names and titles, along with phone numbers, and Applied Underwriters email addresses (i.e., @auw.com):

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

Underwriting:
- Steven Allen – President, Aviation
- David T. Gray – EVP Deputy Head of Aviation
- William C. Harwell – SVP, Underwriting Leader
- Gregory N. Dekker – SVP, Branch Manager
- Donna A. D'Oria – AVP Underwriting Operations Manager
- Kristina B. Mulligan – Executive Underwriter
- Kristina L. Orcutt – Executive Underwriter
- Scott Stewart – VP, Underwriting Lead
  Workers Comp:
- Brian Neal – SVP, Head of Aviation Worker's Compensation
- Jennifer J. Reynolds – Executive Underwriter
  Claims Department:
- Peter F. Guy – EVP, Head of Aviation Claims
- Portia K. Butsko – AVP, Vertical Claims Manager
- Joshua Wilcoxon – AVP, Aviation Claims

98.     According to the website LinkedIn, as of December 16, David Gray, William Harwell, Donna A. D'Oria, Kristina Mulligan, Kristina Orcutt, Scott Stewart, Brian Neal, Jennifer Reynolds, Peter Guy, and Portia Butsko all identified their employer as Applied Underwriting.

99.     The covenants contained in the Employment Agreements signed by Allen and Dekker, including the 90-day notice period and non-solicitation covenants, are reasonably necessary to protect QBE's legitimate business interests.

100.    In coordination with his new employer, Applied, with whom Allen clandestinely met on at least two occasions to hatch his plot, Allen orchestrated a poaching scheme to steal one third of QBE's Aviation division and, along with Orcutt and Mulligan, misappropriate QBE's confidential information—including market analyses, business strategy, and underwriting policy and procedure manuals, checklists, and model policy language —in order to jumpstart Applied's new aviation insurance group. Armed with an experienced group of former QBE employees, and QBE's misappropriated confidential information, Allen, Dekker, Orcutt, Mulligan, and the other former QBE employees wasted no time in beginning to market

23

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

their new Applied aviation insurance group, and target and solicit QBE's policyholders.

101. Because QBE's policyholder, broker, and employee relationships and related goodwill, and QBE's knowledge and expertise, which have been built and fostered over time at considerable expense to QBE, are essential to its business success, Applied must be enjoined from tortiously interfering with Allen's and Dekker's Employment Agreements, and Defendants must be enjoined from unlawfully utilizing QBE's confidential information and trade secrets and unfairly competing with QBE.

102. Only through the issuance of an injunction can Defendants be prevented from irreparably harming and unlawfully competing with QBE to its severe detriment.

### AS AND FOR A FIRST CAUSE OF ACTION
#### (Tortious Interference Against Applied)

103. Plaintiff repeats and realleges each and every allegation contained in Paragraphs "1" through "110" above, with the same force and effect as though set forth herein at length.

104. At all times relevant hereto, Applied was aware that Allen and Dekker were parties to the Employment Agreements with QBE, which govern Allen's and Dekker's conduct during and following their employment with QBE.

105. By virtue of Applied's conduct, including its hiring of Allen and Dekker, and the other 11 QBE Aviation division employees, and its conduct in procuring QBE's confidential and proprietary information and soliciting the business of QBE's policyholders, Applied has interfered with and caused breaches of Allen's and Dekker's Employment Agreements with QBE by Allen and Dekker, and has otherwise interfered with QBE's business and employee relationships.

106. By virtue of its conduct, Applied knowingly, intentionally and maliciously

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

sought to harm QBE.

107.   By virtue of its conduct, Applied used unlawful means to harm QBE.

108.   Applied acted with intentional, malicious and/or wanton disregard of QBE's rights.

109.   Upon information and belief, Applied has profited and will continue to profit from the aforesaid tortious interference with the contractual obligations owed by Allen and Dekker to QBE.

110.   Unless enjoined, Applied will continue to interfere with the contractual obligations owed by Allen and Dekker to QBE and will cause QBE to suffer irreparable harm.

111.   QBE has no adequate remedy at law to prevent this irreparable harm, and is entitled to an injunction prohibiting Applied from interfering with QBE's contractual and business relationships, including those with Allen and Dekker.

112.   As a direct and proximate result of Applied's interference, QBE suffered and will continue to suffer damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business and other damages in an amount which presently is unascertainable but is in excess of $1,000,000, plus interest, and plus exemplary damage.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Misappropriation of Confidential Information Against All Defendants)

113.   Plaintiff repeats and realleges each and every allegation contained in Paragraphs "1" through "120" above, with the same force and effect as though set forth herein at length.

114.   By virtue of their conduct, Orcutt and Mulligan breached their duty not to misappropriate QBE's confidential information.

115.   By virtue of Allen's, Orcutt's and Mulligan's conduct, Applied

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

misappropriated QBE's confidential information and trade secrets.

116.     By virtue of their employment by Applied and their possession of significant and vital confidential information regarding QBE and its policyholders, it is inevitable that Allen, Orcutt, Mulligan, and all the former QBE employees now working for Applied will continue to use and disclose QBE's confidential information.

117.     Allen, Orcutt, and Mulligan, are continuing to use, disclose to others and misappropriate QBE's confidential information.

118.     Defendants have acted with intentional, malicious and/or otherwise wanton disregard of QBE's rights.

119.     Upon information and belief, Defendants have profited and will continue to profit from the aforesaid misappropriation of QBE's confidential information.

120.     Unless enjoined, Defendants' misappropriation of QBE's confidential information will continue and will cause QBE to suffer irreparable harm.

121.     QBE has no adequate remedy at law to prevent this irreparable harm, and is entitled to an injunction prohibiting Defendants from misappropriating QBE's confidential information.

122.     As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages in an amount which presently is unascertainable but is in excess of $1,000,000, plus interest, and plus exemplary damage.

### AS AND FOR A THIRD CAUSE OF ACTION
### (Breach of Duty of Loyalty Against Orcutt and Mulligan)

123.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs "1" through "129" above, with the same force and effect as though set forth herein at length.

26

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

124.    Orcutt and Mulligan were employed by QBE in a position of trust and confidence.

125.    By virtue of their position at QBE, Orcutt and Mulligan each owed a duty of loyalty to QBE both during and after their employment and were obligated not to divert QBE's business in which QBE had a tangible expectancy, and not to subvert or misappropriate QBE Confidential Information.

126.    Orcutt and Mulligan each breached their duties of loyalty owed to QBE by subverting or misappropriating QBE's Confidential Information and Trade Secrets.

127.    Orcutt and Mulligan have acted with intentional, malicious and/or otherwise wanton disregard of QBE's rights.

128.    As a direct and proximate result of Orcutt's and Mulligan's breaches of their duties of loyalty, QBE has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. QBE will continue to suffer this harm unless and until Orcutt and Mulligan are restrained from taking further actions in breach of their duties of loyalty to QBE.

129.    As a direct and proximate result of Orcutt's and Mulligan's breaches of their duties of loyalty, QBE has suffered and will continue to suffer additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and damages in an amount which presently is unascertainable but is in excess of $1,000,000, plus interest, and plus exemplary damage.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Unfair Competition Against All Defendants)

130.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs "1" through "135" above, with the same force and effect as though set forth herein at

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

length.

131.    By virtue of the conduct as alleged herein, Defendants have intentionally, knowingly and maliciously competed unfairly with QBE, including but not limited to their conduct in using, disclosing and/or misappropriating QBE's confidential and proprietary information and trade secrets.

132.    Defendants have acted with intentional, malicious and/or wanton disregard of QBE's rights.   QBE is thus entitled to an award of exemplary damages and reasonable attorneys' fees.

133.    Unless enjoined, Defendants will continue to engage in unfair competition against QBE.

134.    QBE has no adequate remedy at law to prevent this irreparable harm.

135.    Accordingly, QBE is entitled to an injunction prohibiting Defendants from continuing to engage in unfair competition against it.

136.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer the disruption of its business relationships and the loss of clients and potential clients, dilution of good will, injury to its reputation, misappropriation of its skills and expenditures and devaluation of its valuable property rights, benefits, business and commercial practices.

137.    Defendants' misappropriation of Plaintiff's Confidential Information and trade secrets has caused and will continue to cause Plaintiff substantial injury, including but not limited to, actual damages, lost profits, harm to its reputation, and the diminution in value of its valuable property rights and benefits.   Defendants have been unjustly enriched by their misappropriation of QBE's Confidential Information and trade secrets.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

\* \* \*

**WHEREFORE**, Plaintiff QBE prays for judgment against Defendants as follows:

(a) For damages, losses and expenses in an amount which presently is unascertainable but is in excess of $1,000,000, plus interest, plus exemplary damages, or for such other or further amount as the Court deems just and proper;

(b) For an order requiring the Defendants to disgorge all monies they have wrongfully obtained as a result of the foregoing alleged wrongful conduct;

(c) For injunctive relief as set forth herein;

(d) For reasonable attorneys' fees and costs of litigation; and,

(e) For such other and further relief as the Court deems just and proper.

Respectfully submitted,

JACKSON LEWIS P.C.
58 S. Service Road, Suite 250
Melville, New York 11747
(631) 247-0404

By:    /s David S. Greenhaus

David S. Greenhaus, Esq.
Adam G. Guttell, Esq.
Pietro A. Deserio, Esq.

ATTORNEYS FOR PETITIONER

Dated: January 18, 2022
New York, New York

4885-9371-9561, v. 2

29

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2    Case 1:22-cv-00757-JSR    Document 19-1    Filed 02/11/22    Page 34 of 49    RECEIVED NYSCEF: 01/18/2022

# EXHIBIT A

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# EMPLOYMENT AGREEMENT

This Employment Agreement is made as of April 9, 2016 (Effective Date) by and among QBE Americas, Inc., a Delaware corporation (Company) and Steven Allen (Employee).

RECITALS:

WHEREAS, the Company desires to employ the Employee in the position of Senior Vice President, General Aviation; and

WHEREAS, the Employee has accepted such employment; and

WHEREAS, this Agreement sets forth the terms and conditions of the employment relationship between the Company and the Employee;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and the employment of the Employee, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     **Prior Agreements.**

This Agreement supersedes and replaces in its entirety any prior agreements and amendments thereto regarding the Employee's employment with the Company.

2.     **Term.**

The term of this Agreement begins on the Effective Date and continues until terminated in accordance with Section 4 hereof. The Employee agrees and acknowledges that the restrictions set forth in Section 6 shall survive the termination of his employment, whether voluntary or involuntary.

3.     **Compensation and Benefits.**

a) Base Salary. The Employee will receive an initial annual base salary of $265,000.00 payable in accordance with the Company's normal payroll practices and subject to review from time to time in the normal course of business.

b) Short Term Incentive. Employee will be eligible to participate in the Company's 2016 STI Plan, subject to and on a pro-rated basis consistent with the terms, conditions, and overall administration of such plan.

c) Benefits. Employee is eligible for the benefit plans and employment policies offered by the Company under the same terms and conditions offered to similarly-situated employees, subject to and on a basis consistent with the terms, conditions, and overall administration of such benefit plans. Notwithstanding the foregoing, the Company, or its affiliates, has the right to change, amend, or discontinue any employee benefit plans and policies.

4.     **Termination of Employment.**

The Employee's employment under this Agreement will end on the earliest of the events noted below. The Employee acknowledges that the Employee Covenants contained in Section 6 of this Agreement survive its termination and that the consideration noted in

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Section 3 as well as the Employee's new employment with the Company is sufficient compensation for those Covenants.

a) Notice by either Party.

At the Company's option, it may place the Employee on a paid leave of absence for all or part of the periods of notice described below.

    i.    The Employee may terminate this Agreement and his employment by providing at least 90 days' advance notice to the Company.

    ii.    The Company may terminate the Employee's employment without Cause by providing at least 90 days' advance notice to the Employee.

b) Termination For Cause.  A termination of the Employee's employment by the Company or an affiliate shall be deemed a termination for Cause if such termination is on account of:

    i.    the willful fraud or material dishonesty of the Employee in connection with the performance of the Employee's duties to the Company or any affiliate;

    ii.    the deliberate or intentional failure by the Employee to substantially perform the Employee's duties to the Company or any affiliate;

    iii.    conduct by the Employee that is materially detrimental to the reputation, goodwill or business operations of the Company or any affiliate;

    iv.    breach by the Employee of any fiduciary duties owed the Company, any provisions of the Company's Code of Conduct, or any of the covenants set forth in Section 6 hereof; or

    v.    the conviction for, or plea of nolo contendere to a charge of commission of a felony or crime of moral turpitude by the Employee.

The Employee's termination for Cause shall be effective on the date specified in a written notice of termination to the Employee; provided, however, that if the reason for termination for Cause is paragraph (ii) above the Employee shall have been given reasonable opportunity to cure any act or omission that constitutes Cause if capable of cure.

c) Other Reasons.  This Agreement will be terminated upon the Employee's death or disability.  For purposes of this Agreement, "Disabled" means the Employee is, by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve months, receiving income replacement benefits for a period of not less than three months under an accident and health plan covering employees of the Company.  If the Company has no such accident and health plan, "Disabled" means the Employee is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2    Case 1:22-cv-00757-JSR   Document 19-1   Filed 02/11/22   Page 37 of 49    RECEIVED NYSCEF: 01/18/2022

to last for a continuous period of not less than twelve months.

5.    **Consequences of Termination.**

If the Employee's employment is terminated, the Company will pay to the Employee (i) the Employee's earned but unpaid base salary through the effective date of the termination and (ii) any other amounts due to the Employee from the Company or any affiliate as of the effective date of the termination, such as approved, unreimbursed business expenses and paid time off balances. Such payments will be made in accordance with the established timing and practices of the Company.

Participation in benefit and bonus plans will be governed by the terms of those plans then in effect.

6.    **Employee Covenants.** For purposes of this section, "Company" means the Company and its subsidiaries, parent companies, and affiliated companies.

a)    <u>Non-disclosure of Confidential Information</u>. "Confidential Information" means data and information relating to the business of the Company; disclosed to the Employee or of which the Employee becomes aware as a consequence of the Employee's relationship with the Company; having value to the Company; and not generally known to competitors of the Company.  Subject to the foregoing, Confidential Information includes, but is not limited to, business development, marketing and sales programs, customer, potential customer and supplier/vendor information, pricing information, personnel information, financial data, regulatory approval strategies, investigative records, research, testing methodologies and results, computer programs, programs and protocols, and related items used by the Company in its business, whether contained in written form, computerized records, models, prototypes or any other format and any and all information obtained in writing, orally or visually during visits to offices of the Company. Confidential Information shall not include any information that (i) is or becomes generally available to the public other than as a result of an unauthorized disclosure, (ii) has been independently developed and disclosed by others without violating this Agreement, or (iii) otherwise enters the public domain through lawful means.

The Employee agrees that while employed by the Company, the Employee will have contact with and will become aware of the Company's Confidential Information, and that Employee will benefit and add to the Company goodwill with its clients and in the marketplace generally.  The Employee further agrees that loss of such clients will cause the Company significant and irreparable harm and that the restrictions on the Employee's use of such Confidential Information are reasonable and necessary to protect the Company's legitimate business interests in its Confidential Information. Accordingly, the Employee will not at any time during the Employee's employment by the Company, or for so long thereafter as the pertinent information or documentation constitutes Confidential Information as defined above, use or disclose to others any Confidential Information, except as specifically authorized in a signed writing by the Company or in the performance of work assigned to the Employee by the Company. The covenants made by the Employee herein are in addition to, and not exclusive of, any and all other rights to which the Company is entitled under federal and state law, including, but not limited to, rights provided under copyright and trade secret laws, and laws concerning fiduciary duties.

The Employee hereby agrees not to disclose, copy, or remove from the premises of the Company any documents, records, tapes or other media or format that contain or may contain Confidential Information, except as required by the nature of the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 01/18/2022

Case 1:22-cv-00757-JSR   Document 19-1   Filed 02/11/22   Page 38 of 49

Employee's duties for the Company.

b)  <u>Return of Company Property</u>. Promptly following the termination of the Employee's employment for any reason, the Employee will return to Company all confidential information and other property of Company and its affiliates and subsidiaries and all information relating to the actual and prospective policyholders, agents, and brokers of the Company and its affiliates and subsidiaries that the Employee may possess or have under his control, together with all copies thereof, including but not limited to company hardware, records, memoranda, notes, plans, reports, computer tapes, software and other documents and data containing confidential information.

c)  <u>Broker, Agent, and Policyholder Non-solicitation</u>. The Employee agrees that during the Employee's employment with the Company and for 12 months following a termination of employment that occurs for any reason, the Employee will not solicit any broker, agent or policyholder of the Company on behalf of the Employee or any other person, firm, company, or organization, either directly or indirectly, for the purpose of soliciting or obtaining insurance business or any account that was business or an account of the Company's during the 12 months prior to the Employee's termination of employment from the Company. The Employee further agrees that during the Employee's employment with the Company and for 12 months following a termination of employment that occurs for any reason, the Employee shall not contact any broker, agent or policyholder of the Company to discourage such entity or individual from doing business with Company, nor accept any business or account from any broker, agent, or policyholder that was business or an account of Company's during the 12 months prior to the Employee's termination of employment from the Company. For the avoidance of doubt, nothing in this paragraph shall be construed to prohibit Employee from soliciting any broker, agent, or policyholder for insurance business or accounts that were not Company business or accounts in the 12 months prior to the Employee's termination of employment from the Company.

d)  <u>Employee Non-solicitation</u>. The Employee agrees that during the Employee's employment with the Company and for 12 months following a termination of employment that occurs for any reason, the Employee will not:

   i.  recruit, hire, or attempt to recruit or hire, directly or by assisting others, any then- current employee of the Company for employment with an entity other than the Company; or

   ii.  entice or attempt to persuade the Company's then-current employees to leave employment with the Company.

For purposes of this Section 6, "solicit" means any direct or indirect communication of any kind, regardless of who initiates it, that in any way invites, advises, encourages or requests any person to take or refrain from taking any action.

e)  <u>Absence of Prior Obligations</u>. The Employee represents and warrants to the Company that the Employee is not bound by any restrictive covenants and has no prior or other obligations or commitments of any kind that would in any way prevent, restrict, hinder, or interfere with the Employee's acceptance of employment with the Company or the performance of all duties and services of Senior Vice President, General Aviation, to the fullest extent of your ability and knowledge. The Employee agrees to indemnify and hold harmless the Company for any liability the Company may incur as the result of the existence of any such covenants, obligations, or commitments. The indemnification and hold harmless requirements of this Subsection e) are only effective if a final judgment is rendered against the Company and the Employee.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2     Case 1:22-cv-00757-JSR     Document 19-1     Filed 02/11/22     Page 39 of 49     RECEIVED NYSCEF: 01/18/2022

f)   <u>Reasonableness</u>.  The Employee acknowledges that the provisions contained in this Section 6 are reasonable and necessary to protect the Company's interests in its good will, business relationships, and confidential information and that the Company will suffer substantial harm if the Employee engages in any of the prohibited activities.   The Employee warrants that no provision of this Section 6 will work to prevent the Employee from earning a living.

g)   <u>Enforcement</u>.  It is the desire and intent of the parties hereto that the provisions of Section 6 of this Agreement be construed independently of one another to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Each restriction contained in this Section 6 is intended to be severable, and the unenforceability of any such provision shall not affect the enforceability of any other provision of Section 6.  The Company shall be entitled to all rights and remedies as set forth in this Section 6 until the expiration of the covenants contained herein in accordance with their terms.  The parties agree and acknowledge that damages will be difficult, if not impossible, to calculate in the event of a breach, or threatened breach, of any of the provisions of this Section 6 and, in any event, damages will be an insufficient remedy in the event of such breach. Accordingly, the parties agree that the Company shall, in addition to all other remedies, be entitled to injunctive relief in the event of any breach of the provisions of this Section 6.

7.   **Miscellaneous**

a)   <u>Confidential Information</u>.  The Employee acknowledges that he/she will receive confidential information of the Company as a necessary part of the Employee's job. Such confidential information may include, but is not limited to, customer lists, employee information, pricing information, marketing strategies, Company financial results, and information related to mergers and acquisitions.

b)   <u>Tax Withholding</u>.  The Employee shall be liable for all income taxes incurred with respect to all benefits provided under this Agreement unless otherwise specified.  All payments required to be made to the Employee under this Agreement shall be subject to withholding of amounts relating to income tax, excise tax, employment tax and other payroll taxes to the extent the Company determines is required to be withheld pursuant to applicable law or regulation.

c)   <u>Internal Revenue Code Section 409A</u>.  It is the intention of the parties that any payments due under this Agreement be exempt from Internal Revenue Code Section 409A (409A).  In the event such payments may be subject to 409A, the parties agree to mutual cooperation to amend this Agreement to ensure compliance with the applicable provisions of 409A.

d)   <u>Successors and Assigns</u>.  This Agreement and all rights hereunder are personal to the Employee and shall not be assignable by the Employee; <u>provided</u>, <u>however</u>, that any amounts that shall have become payable under this Agreement prior to the Employee's death shall inure to the benefit of the Employee's heirs or other legal representatives, as the case may be.  This Agreement shall be binding upon and inure to the benefit of the Company's successors, including any entity that succeeds to the business and interests of the Company. The Company may assign this Agreement to any subsidiary or affiliate in its sole discretion.

e)   <u>Severability</u>.  In the event that any provision of this Agreement is determined to be partially or wholly invalid, illegal, unenforceable, or unreasonable or excessive as to duration, geographic scope, or activity, then such provision shall be modified or

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

restricted to the extent necessary to make such provision valid, binding and enforceable. Any provision that is modified shall be construed by limiting and reducing it to the maximum time, geographic or scope limitations, as the case may be, so as to be reasonable and enforceable to the extent compatible with the applicable law. If such provision cannot be modified or restricted, then such provision shall be deemed to be excised from this Agreement, provided that the binding effect and enforceability of the remaining provisions of this Agreement shall not be affected or impaired in any manner.

f)  <u>Amendment</u>. No amendment to this Agreement shall be deemed valid unless in writing and signed by the parties.

g)  <u>Notices</u>. Any notices to be given under this Agreement may be made by personal delivery, e-mail, or registered or certified mail. Notice by personal delivery or mail will be deemed made on the date of actual receipt. E-mail notices must be sent to the last-known business e-mail address of the party to whom the notice is being sent, with Read Receipt enabled. Notices by e-mail will be deemed delivered when the Read Receipt message is returned to the sender.

Notice to the Company shall be addressed to:

QBE Americas, Inc.
One General Drive
Sun Prairie, Wisconsin 53596
Attn: Jackie Thies
(608) 825-5602
jackie.thies@us.qbe.com

Notice to the Employee shall be addressed to the Employee at the home address most recently provided to the Company or to the business e-mail address provided by the Company for the Employee.

h)  <u>Governing Law</u>. This Agreement shall be governed by and enforceable in accordance with the laws of the State of New York as applicable to contracts executed and performed within such state, without giving effect to the principles of conflict of laws thereof.

i)  <u>Arbitration</u>. Any dispute or controversy arising under or in connection with this Agreement shall be settled exclusively by arbitration, conducted before a single arbitrator in the state of New York in accordance with the rules of the American Arbitration Association then in effect. An arbitrator cannot award any amount to the Employee greater than the Employee would have otherwise received under this Agreement. The Company shall pay all the costs and expenses of any such arbitration proceeding, and the parties shall each pay their own attorneys' fees and expenses. Notwithstanding the foregoing, either party hereto may petition any state or federal court having jurisdiction to provide equitable relief to enjoin or prohibit ongoing and irreparable injury to the petitioning party due to any violation of this Agreement, including but not limited to a violation of Section 6 of this Agreement.

j)  <u>Captions and Headings</u>. Captions and paragraph headings are for convenience only, are not a part of this Agreement, and shall not be used to construe any provision of this Agreement.

k)  <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall constitute an original, but both of which when taken together shall constitute one Agreement.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## SIGNATURE PAGE TO FOLLOW

Agreed to by:

**QBE Americas, Inc.**

_____

**By:** _____

**Its:** _____

**Date:** _____

**Steven Allen**

_____

**Date:**
March 26, 2016

_____

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

# EXHIBIT B

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)   INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 3   Case 1:22-cv-00757-JSR   Document 19-1   Filed 02/11/22   Page 43 of 49   RECEIVED NYSCEF: 01/18/2022

## EMPLOYMENT AGREEMENT

This Employment Agreement is made as of May 9, 2016 (Effective Date) by and among QBE Americas, Inc., a Delaware corporation (Company) and Gregory Dekker (Employee).

RECITALS:

WHEREAS, the Company desires to employ the Employee in the position of Vice President – Aviation Underwriting; and

WHEREAS, the Employee has accepted such employment; and

WHEREAS, this Agreement sets forth the terms and conditions of the employment relationship between the Company and the Employee;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and the employment of the Employee, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.   **Prior Agreements.**

This Agreement supersedes and replaces in its entirety any prior agreements and amendments thereto regarding the Employee's employment with the Company.

2.   **Term.**

The term of this Agreement begins on the Effective Date and continues until terminated in accordance with Section 4 hereof. The Employee agrees and acknowledges that the restrictions set forth in Section 6 shall survive the termination of his employment, whether voluntary or involuntary.

3.   **Compensation and Benefits.**

a) <u>Base Salary</u>. The Employee will receive an initial annual base salary of $220,000.00 payable in accordance with the Company's normal payroll practices and subject to review from time to time in the normal course of business.

b) <u>Short Term Incentive</u>. Employee will be eligible to participate in the Company's 2016 STI Plan, subject to and on a basis consistent with the terms, conditions, and overall administration of such plan.

c) <u>Benefits</u>. Employee is eligible for the benefit plans and employment policies offered by the Company under the same terms and conditions offered to similarly-situated employees, subject to and on a basis consistent with the terms, conditions, and overall administration of such benefit plans.  Notwithstanding the foregoing, the Company, or its affiliates, has the right to change, amend, or discontinue any employee benefit plans and policies.

4.   **Termination of Employment.**

The Employee's employment under this Agreement will end on the earliest of the events noted below.  The Employee acknowledges that the Employee Covenants contained in Section 6 of this Agreement survive its termination and that the consideration noted in

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Section 3 as well as the Employee's new employment with the Company is sufficient compensation for those Covenants.

a) Notice by either Party.

At the Company's option, it may place the Employee on a paid leave of absence for all or part of the periods of notice described below.

   i. The Employee may terminate this Agreement and his employment by providing at least 90 days' advance notice to the Company.

   ii. The Company may terminate the Employee's employment without Cause by providing at least 90 days' advance notice to the Employee.

b) Termination For Cause. A termination of the Employee's employment by the Company or an affiliate shall be deemed a termination for Cause if such termination is on account of:

   i. the willful fraud or material dishonesty of the Employee in connection with the performance of the Employee's duties to the Company or any affiliate;

   ii. the deliberate or intentional failure by the Employee to substantially perform the Employee's duties to the Company or any affiliate;

   iii. conduct by the Employee that is materially detrimental to the reputation, goodwill or business operations of the Company or any affiliate;

   iv. breach by the Employee of any fiduciary duties owed the Company, any provisions of the Company's Code of Conduct, or any of the covenants set forth in Section 6 hereof; or

   v. the conviction for, or plea of nolo contendere to a charge of commission of a felony or crime of moral turpitude by the Employee.

The Employee's termination for Cause shall be effective on the date specified in a written notice of termination to the Employee; provided, however, that if the reason for termination for Cause is paragraph (ii) above the Employee shall have been given reasonable opportunity to cure any act or omission that constitutes Cause if capable of cure.

c) Other Reasons. This Agreement will be terminated upon the Employee's death or disability. For purposes of this Agreement, "Disabled" means the Employee is, by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve months, receiving income replacement benefits for a period of not less than three months under an accident and health plan covering employees of the Company. If the Company has no such accident and health plan, "Disabled" means the Employee is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve months.

**5.**   **Consequences of Termination.**

If the Employee's employment is terminated, the Company will pay to the Employee (i) the Employee's earned but unpaid base salary through the effective date of the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 3    Case 1:22-cv-00757-JSR    Document 19-1    Filed 02/11/22    Page 45 of 49    RECEIVED NYSCEF: 01/18/2022

termination and (ii) any other amounts due to the Employee from the Company or any affiliate as of the effective date of the termination, such as approved, unreimbursed business expenses and paid time off balances. Such payments will be made in accordance with the established timing and practices of the Company.

Participation in benefit and bonus plans will be governed by the terms of those plans then in effect.

6.  **Employee Covenants.** For purposes of this section, "Company" means the Company and its subsidiaries, parent companies, and affiliated companies.

a)  Non-disclosure of Confidential Information.  "Confidential Information" means data and information relating to the business of the Company; disclosed to the Employee or of which the Employee becomes aware as a consequence of the Employee's relationship with the Company; having value to the Company; and not generally known to competitors of the Company.  Subject to the foregoing, Confidential Information includes, but is not limited to, business development, marketing and sales programs, customer, potential customer and supplier/vendor information, pricing information, personnel information, financial data, regulatory approval strategies, investigative records, research, testing methodologies and results, computer programs, programs and protocols, and related items used by the Company in its business, whether contained in written form, computerized records, models, prototypes or any other format and any and all information obtained in writing, orally or visually during visits to offices of the Company. Confidential Information shall not include any information that (i) is or becomes generally available to the public other than as a result of an unauthorized disclosure, (ii) has been independently developed and disclosed by others without violating this Agreement, or (iii) otherwise enters the public domain through lawful means.

The Employee agrees that while employed by the Company, the Employee will have contact with and will become aware of the Company's Confidential Information, and that Employee will benefit and add to the Company goodwill with its clients and in the marketplace generally.  The Employee further agrees that loss of such clients will cause the Company significant and irreparable harm and that the restrictions on the Employee's use of such Confidential Information are reasonable and necessary to protect the Company's legitimate business interests in its Confidential Information. Accordingly, the Employee will not at any time during the Employee's employment by the Company, or for so long thereafter as the pertinent information or documentation constitutes Confidential Information as defined above, use or disclose to others any Confidential Information, except as specifically authorized in a signed writing by the Company or in the performance of work assigned to the Employee by the Company. The covenants made by the Employee herein are in addition to, and not exclusive of, any and all other rights to which the Company is entitled under federal and state law, including, but not limited to, rights provided under copyright and trade secret laws, and laws concerning fiduciary duties.

The Employee hereby agrees not to disclose, copy, or remove from the premises of the Company any documents, records, tapes or other media or format that contain or may contain Confidential Information, except as required by the nature of the Employee's duties for the Company.

b)  Return of Company Property. Promptly following the termination of the Employee's employment for any reason, the Employee will return to Company all confidential information and other property of Company and its affiliates and subsidiaries and all information relating to the actual and prospective policyholders, agents, and brokers of the Company and its affiliates and subsidiaries that the Employee may possess or have under his control, together with all copies thereof, including but not limited to

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 3    Case 1:22-cv-00757-JSR    Document 19-1    Filed 02/11/22    Page 46 of 49    RECEIVED NYSCEF: 01/18/2022

company hardware, records, memoranda, notes, plans, reports, computer tapes, software and other documents and data containing confidential information.

c) <u>Broker, Agent, and Policyholder Non-solicitation</u>. The Employee agrees that during the Employee's employment with the Company and for 12 months following a termination of employment that occurs for any reason, the Employee will not solicit any broker, agent or policyholder of the Company on behalf of the Employee or any other person, firm, company, or organization, either directly or indirectly, for the purpose of soliciting or obtaining insurance business or any account that was business or an account of the Company's during the 12 months prior to the Employee's termination of employment from the Company. The Employee further agrees that during the Employee's employment with the Company and for 12 months following a termination of employment that occurs for any reason, the Employee shall not contact any broker, agent or policyholder of the Company to discourage such entity or individual from doing business with Company, nor accept any business or account from any broker, agent, or policyholder that was business or an account of Company's during the 12 months prior to the Employee's termination of employment from the Company. For the avoidance of doubt, nothing in this paragraph shall be construed to prohibit Employee from soliciting any broker, agent, or policyholder for insurance business or accounts that were not Company business or accounts in the 12 months prior to the Employee's termination of employment from the Company.

d) <u>Employee Non-solicitation</u>. The Employee agrees that during the Employee's employment with the Company and for 12 months following a termination of employment that occurs for any reason, the Employee will not:

   i.    recruit, hire, or attempt to recruit or hire, directly or by assisting others, any then- current employee of the Company for employment with an entity other than the Company; or

   ii.   entice or attempt to persuade the Company's then-current employees to leave employment with the Company.

For purposes of this Section 6, "solicit" means any direct or indirect communication of any kind, regardless of who initiates it, that in any way invites, advises, encourages or requests any person to take or refrain from taking any action.

e) <u>Absence of Prior Obligations</u>. The Employee represents and warrants to the Company that the Employee is not bound by any restrictive covenants and has no prior or other obligations or commitments of any kind that would in any way prevent, restrict, hinder, or interfere with the Employee's acceptance of employment with the Company or the performance of all duties and services of Vice President – Aviation Underwriting, to the fullest extent of the Employee's ability and knowledge. The Employee agrees to indemnify and hold harmless the Company for any liability the Company may incur as the result of the existence of any such covenants, obligations, or commitments. The indemnification and hold harmless requirements of this Subsection e) are only effective if a final judgment is rendered against the Company and the Employee.

f) <u>Reasonableness</u>. The Employee acknowledges that the provisions contained in this Section 6 are reasonable and necessary to protect the Company's interests in its good will, business relationships, and confidential information and that the Company will suffer substantial harm if the Employee engages in any of the prohibited activities. The Employee warrants that no provision of this Section 6 will work to prevent the Employee from earning a living.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

g) <u>Enforcement</u>.  It is the desire and intent of the parties hereto that the provisions of Section 6 of this Agreement be construed independently of one another to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Each restriction contained in this Section 6 is intended to be severable, and the unenforceability of any such provision shall not affect the enforceability of any other provision of Section 6.  The Company shall be entitled to all rights and remedies as set forth in this Section 6 until the expiration of the covenants contained herein in accordance with their terms.  The parties agree and acknowledge that damages will be difficult, if not impossible, to calculate in the event of a breach, or threatened breach, of any of the provisions of this Section 6 and, in any event, damages will be an insufficient remedy in the event of such breach.  Accordingly, the parties agree that the Company shall, in addition to all other remedies, be entitled to injunctive relief in the event of any breach of the provisions of this Section 6.

## 7.     Miscellaneous

a) <u>Confidential Information</u>.  The Employee acknowledges that he/she will receive confidential information of the Company as a necessary part of the Employee's job.  Such confidential information may include, but is not limited to, customer lists, employee information, pricing information, marketing strategies, Company financial results, and information related to mergers and acquisitions.

b) <u>Tax Withholding</u>.  The Employee shall be liable for all income taxes incurred with respect to all benefits provided under this Agreement unless otherwise specified.  All payments required to be made to the Employee under this Agreement shall be subject to withholding of amounts relating to income tax, excise tax, employment tax and other payroll taxes to the extent the Company determines is required to be withheld pursuant to applicable law or regulation.

c) <u>Internal Revenue Code Section 409A</u>.  It is the intention of the parties that any payments due under this Agreement be exempt from Internal Revenue Code Section 409A (409A).  In the event such payments may be subject to 409A, the parties agree to mutual cooperation to amend this Agreement to ensure compliance with the applicable provisions of 409A.

d) <u>Successors and Assigns</u>.  This Agreement and all rights hereunder are personal to the Employee and shall not be assignable by the Employee; <u>provided</u>, <u>however</u>, that any amounts that shall have become payable under this Agreement prior to the Employee's death shall inure to the benefit of the Employee's heirs or other legal representatives, as the case may be.  This Agreement shall be binding upon and inure to the benefit of the Company's successors, including any entity that succeeds to the business and interests of the Company. The Company may assign this Agreement to any subsidiary or affiliate in its sole discretion.

e) <u>Severability</u>.  In the event that any provision of this Agreement is determined to be partially or wholly invalid, illegal, unenforceable, or unreasonable or excessive as to duration, geographic scope, or activity, then such provision shall be modified or restricted to the extent necessary to make such provision valid, binding and enforceable.  Any provision that is modified shall be construed by limiting and reducing it to the maximum time, geographic or scope limitations, as the case may be, so as to be reasonable and enforceable to the extent compatible with the applicable law.  If such provision cannot be modified or restricted, then such provision shall be deemed to be excised from this Agreement, provided that the binding effect and enforceability of the remaining provisions of this Agreement shall not be affected or impaired in any manner.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

f) <u>Amendment</u>. No amendment to this Agreement shall be deemed valid unless in writing and signed by the parties.

g) <u>Notices</u>. Any notices to be given under this Agreement may be made by personal delivery, e-mail, or registered or certified mail. Notice by personal delivery or mail will be deemed made on the date of actual receipt. E-mail notices must be sent to the last-known business e-mail address of the party to whom the notice is being sent, with Read Receipt enabled. Notices by e-mail will be deemed delivered when the Read Receipt message is returned to the sender.

Notice to the Company shall be addressed to:

QBE Americas, Inc.
One General Drive
Sun Prairie, Wisconsin 53596
Attn: Jackie Thies
(608) 825-5602
jackie.thies@us.qbe.com

Notice to the Employee shall be addressed to the Employee at the home address most recently provided to the Company or to the business e-mail address provided by the Company for the Employee.

h) <u>Governing Law</u>. This Agreement shall be governed by and enforceable in accordance with the laws of the State of New York as applicable to contracts executed and performed within such state, without giving effect to the principles of conflict of laws thereof.

i) <u>Arbitration</u>. Any dispute or controversy arising under or in connection with this Agreement shall be settled exclusively by arbitration, conducted before a single arbitrator in the state of New York in accordance with the rules of the American Arbitration Association then in effect. An arbitrator cannot award any amount to the Employee greater than the Employee would have otherwise received under this Agreement. The Company shall pay all the costs and expenses of any such arbitration proceeding, and the parties shall each pay their own attorneys' fees and expenses. Notwithstanding the foregoing, either party hereto may petition any state or federal court having jurisdiction to provide equitable relief to enjoin or prohibit ongoing and irreparable injury to the petitioning party due to any violation of this Agreement, including but not limited to a violation of Section 6 of this Agreement.

j) <u>Captions and Headings</u>. Captions and paragraph headings are for convenience only, are not a part of this Agreement, and shall not be used to construe any provision of this Agreement.

k) <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall constitute an original, but both of which when taken together shall constitute one Agreement.

**SIGNATURE PAGE TO FOLLOW**

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)          INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 3          Case 1:22-cv-00757-JSR   Document 19-1   Filed 02/11/22   Page 49 of 49          RECEIVED NYSCEF: 01/18/2022

Agreed to by:

**QBE Americas, Inc.**

By: _____

Its: _____

Date: _____

Gregory Dekker _____

Date: _____

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.