UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

QBE AMERICAS, INC., d/b/a
QBE NORTH AMERICA

     Petitioner,

     -v-

STEVEN ALLEN and GREGORY
DEKKER,

     Respondents.

22-cv-756 (JSR)

---

QBE AMERICAS, INC., d/b/a
QBE NORTH AMERICA

     Plaintiff,

     -v-

KRISTINA ORCUTT, KRISTINA
MULLIGAN, and APPLIED
UNDERWRITERS, INC.

     Defendants.

22-cv-757 (JSR)

MEMORANDUM ORDER

---

JED S. RAKOFF, U.S.D.J.:

     Before the Court are three motions in two pending actions brought by plaintiff-petitioner QBE Americas, Inc. d/b/a QBE North America ("QBE"), a component of a multinational insurance company, against the former leader of its North American entity's aviation insurance division, respondent Steven Allen; three former employees of that division, respondent Gregory Dekker, defendant Kristina Orcutt, and defendant Kristina Mulligan; and the rival insurance company to which the Allen, Dekker, Orcutt, and Mulligan decamped to start a new aviation insurance unit, defendant Applied Underwriters, Inc.

("Applied"). QBE was previously granted temporary restraining orders ("TROs") in both actions. The TROs enjoined all defendants from further disclosing or using allegedly confidential QBE documents containing trade secrets; enjoined Allen, Dekker, and Applied from soliciting or servicing any aviation insurance policyholder that had been a QBE client within the 12 months before October 1, 2021; and enjoined Allen, Dekker, and Applied from soliciting any employees in QBE's Aviation Division to leave their jobs. Allen ECF 12; Orcutt ECF 13.[1] QBE now moves to convert these TROs into preliminary injunctions, with certain modifications, to apply during the pendency of QBE's arbitration against Allen and Dekker and its lawsuit against Orcutt, Mulligan, and Applied. Allen ECF 16; Orcutt ECF 22.[2] Separately, Orcutt, a resident of Arizona, and Mulligan, a resident of Georgia, have moved to dismiss the complaint against them, arguing that the Court lacks personal jurisdiction. Orcutt ECF 17 ("MTD").

The Court has carefully considered the parties' voluminous documentary submissions, the testimony and evidence adduced at the three-day evidentiary hearing held in connection with all three pending

---

[1] Unless otherwise specified, all internal quotation marks, citations, omissions, elisions, emphases, and alterations are omitted from all sources cited herein. Documents filed on the 22-cv-756 docket are referenced by "Allen ECF ___" and documents filed on the 22-cv-757 docket referenced by "Orcutt ECF ___."

[2] With leave of the Court and to promote judicial efficiency, the parties filed one consolidated set of briefing papers concerning the two preliminary injunction motions. See Allen Minute Entry 2/2/2022. These papers were filed on the Allen docket and incorporated by reference to the motion filed in the Orcutt action.

motions, and the oral and written presentations of counsel. For the reasons set forth below the Court grants Orcutt and Mulligan's motion to dismiss, because New York State's long-arm statute provides no basis for personal jurisdiction. The Court also grants in part and denies in part QBE's motions for preliminary injunction. Specifically, the Court grants QBE's request to enjoin Allen, Dekker, and Applied from possessing, disclosing, or using any confidential QBE documents or information in their possession. The Court further grants in part QBE's request to enjoin Allen, Dekker, and Applied from soliciting any QBE aviation insurance policyholder that has been a policyholder since October 1, 2020 and with which QBE seeks to renew its policy. The contours of this relief and the procedure for the parties to follow are further specified in the conclusion of this order. However, the Court denies QBE's request to enjoin Allen, Dekker, and Applied from soliciting QBE aviation insurance employees to follow Allen et al. to Applied.

The Court assumes the parties' familiarity with the facts and procedural posture of these cases and sets forth the facts only as necessary for the analysis.

## I.   <u>Orcutt and Mulligan's Motion to Dismiss</u>

Defendants Orcutt and Mulligan moved to dismiss the <u>Orcutt</u> complaint under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. For reasons explained below, the Court holds that there is no statutory basis for personal jurisdiction over them, so their motion to dismiss must be granted.

A. **Background**

QBE and Applied are both headquartered in New York City. See 2d Declaration of Steven L. Gransbury, Allen ECF 19 ¶¶ 3, 60. However, neither of the individual Orcutt defendants lives or works in New York.

Orcutt was employed by QBE from April 2017 through September 2021 as a senior underwriter in QBE's aviation division. Declaration of Kristina Orcutt, Orcutt ECF 20 ("Orcutt MTD Decl.") ¶ 4. Orcutt was born, raised, and has always lived in Arizona. Id. ¶ 3. She has never lived, worked, or studied in New York. Id. She previously worked for AIG as a senior underwriter in its aviation insurance group. Id. ¶ 5. As a QBE employee, she worked from home in Gilbert, AZ, servicing the west coast region and "not conduct[ing] or transact[ing] business within the State of New York." Id. ¶¶ 8-9. During her employment, Orcutt traveled to New York "2 or 3 times at QBE's request," to "work[] on the insurance aviation computer system for quoting and ratings with the system developers." Id. ¶ 10. Orcutt never had a written employment agreement. Id. ¶ 4.

Mulligan was employed in various underwriting roles at QBE from September 2012 to September 2021 in the Atlanta office, eventually in the aviation department. Declaration of Kristina Mulligan, Orcutt ECF 21 ("Mulligan MTD Decl.") ¶¶ 5, 7. She previously worked for AIG and Allianz in Atlanta. Id. Mulligan did not have a written employment agreement with QBE. Id. ¶ 6. Mulligan reports taking only one trip to New York in connection with her work at QBE: a May 2019 trip to assist

developers with improvements to a computer system. Id. ¶ 8. Mulligan
lives in Roswell, Georgia and has never lived outside Georgia. Id. ¶
3.

### B. Discussion

As QBE concedes, neither Orcutt, who has lived and worked in
Arizona her whole life, nor Mulligan, who has lived and worked in
Georgia her whole life, is a domiciliary of New York. The Court thus
lacks in personam jurisdiction over them under New York's general
jurisdiction statute, CPLR 301. Therefore, if specific personal
jurisdiction over Orcutt and Mulligan exists, then it must be a
function of New York's long-arm statute, CPLR 302, which provides, in
relevant part:

> (a) Acts which are the basis of jurisdiction. As to a cause of
> action arising from any of the acts enumerated in this section,
> a court may exercise personal jurisdiction over any non-
> domiciliary ... who in person or through an agent:
>
>> 1. transacts any business within the state or contracts
>> anywhere to supply goods or services in the state; or
>>
>> 2. commits a tortious act within the state, except as to a
>> cause of action for defamation of character arising from
>> the act; or
>>
>> 3. commits a tortious act without the state causing injury
>> to person or property within the state, except as to a
>> cause of action for defamation of character arising from
>> the act, if he ...
>>
>>> (ii) expects or should reasonably expect the act to
>>> have consequences in the state and derives substantial
>>> revenue from interstate or international commerce; or

CPLR 302. QBE contends that each of these three subsections confers
on the Court personal jurisdiction over Orcutt and Mulligan.

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996). However, at the pleadings stage, a plaintiff need only make out a prima facie case for jurisdiction, Cutco Industries, Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir.1986), so a court may find that a complaint adequately pleads jurisdiction if the allegations are taken as true. Id. at 567. However, if jurisdictional facts are in dispute, the Court may consider any extrinsic evidence, including documentary evidence, affidavits, and testimony and, if the Court decides to hold a "full-blown evidentiary hearing on the motion," then it may resolve factual disputes. Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981).

After reviewing the pleadings and motion papers, the Court determined that it was necessary to take evidence on factual questions relevant to Orcutt and Mulligan's motion. The Court therefore took testimony and received documentary evidence germane to the motion to dismiss as part of the consolidated evidentiary hearing. The Court is thus authorized to decide factual issues pertinent to the Rule 12(b)(2) motion, so the analysis set forth below reflects the Court's findings of fact arising from the relevant evidence, as well as from the pleadings, declarations, and supporting documents both received in evidence at the hearing and already in the record.

For the reasons set forth below, the Court holds that it lacks a statutory basis to assert personal jurisdiction over either Orcutt or

Mulligan in this lawsuit under the New York long-arm statute. The Court addresses the relevant subsections out of order for ease of presentation.

  1. CPLR 302(a)(2)

CPLR 302(a)(2) provides long-arm jurisdiction over a non-domiciliary who, either directly or through an agent, committed a tortious act within New York. QBE's theory of personal jurisdiction over Orcutt and Mulligan under CPLR 302(a)(2) is that they conspired with Allen, who acted as their "agent" in traveling to New York in June and August 2021 to meet with Applied and negotiate the departure of all 13 people from QBE.

Construing CPLR 302(a)(2), "[c]ourts have defined 'agent' broadly to include not only a defendant's formal agents, but also, under certain circumstances, a defendant's co-conspirators." Chrysler Cap. Corp. v. Century Power Corp., 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991); New Media Holding Co. LLC v. Kagalovsky, 97 A.D.3d 463, 464-465 (1st Dep't 2012). To establish personal jurisdiction through a co-conspirator's in-state actions, the plaintiff must "(1) ... make a prima facie factual showing of a conspiracy; ... (2) ... allege specific facts warranting the inference that the defendant was a member of the conspiracy;" and (3) "show that the defendant's co-conspirator committed a tortious act in New York." Chrysler Cap. Corp., 778 F. Supp. at 1266.

To make out a prima facie case of civil conspiracy under New York law, the plaintiff must adequately plead the following four elements:

"(1) the corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage." Kashi v. Gratsos, 790 F.2d 1050, 1055 (2d Cir. 1986). "Under New York law, a defendant may be held liable in tort for conspiracy to do an unlawful thing, or to do a lawful thing in an unlawful manner." Arlinghaus v. Ritenour, 622 F.2d 629, 639 (2d Cir. 1980).

To establish the defendant's membership in the conspiracy for the purpose of establishing long-arm jurisdiction, the plaintiff must adequately plead that: (a) "the defendant had an awareness of the effects in New York of its activity;" (b) "the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators;" and (c) "the co-conspirators acting in New York acted 'at the direction or under the control,' or 'at the request of or on behalf of' the out-of-state defendant." Dixon v. Mack, 507 F. Supp. 345, 350 (S.D.N.Y. 1980).

QBE argues, in essence, that Orcutt and Mulligan conspired with Allen and the others to leave QBE and to take certain confidential business information from QBE that would help them start a new aviation insurance business at Applied. On this theory, Allen's June and August 2021 trips to New York to negotiate with Applied was for Orcutt and Mulligan's benefit and either "at the direction or under the control" or "at the request of or on the behalf of" Orcutt and Mulligan. Dixon, 507 F. Supp. at 350.

The Court concludes that QBE's jurisdictional theory fails for two legally independent but factually related reasons. As QBE implicitly acknowledges, for Orcutt and Mulligan to be subject to long-arm jurisdiction via Allen's allegedly tortious acts on his June and August trips to New York City to meet with Applied, a conspiracy would have had to exist and Orcutt and Mulligan would have had to be members before one or both of those trips occurred. However, the direct evidence adduced at the evidentiary hearing is that Allen first broached with Orcutt the topic of decamping for Applied after he had completed the August 12, 2021 meeting in New York. See, e.g. Tr. 138, 177-180. While there is some dispute about the nature and scope of that conversation (e.g., did it occur only by text message, per Allen's testimony, or include a phone call, as Orcutt asserts? Did they discuss sequestering confidential QBE documents?), QBE has presented no affirmative evidence that Allen spoke to Orcutt before either New York meeting about a plan to move to Applied. Ditto with Mulligan. See Declaration of Kristina Mulligan, Allen ECF 26 ("Mulligan PI Decl.") ¶ 10. While QBE asks the Court to infer earlier conversations, the Court declines to adopt QBE's strained inferences.

Since the evidence shows that Allen never discussed moving to Applied with Orcutt or Mulligan before he attended the New York meetings, there is no factual basis to find that an agreement (let alone a corrupt agreement) existed before Allen's allegedly tortious acts occurred in New York. Gratsos, 790 F.2d at 1055. Therefore, Allen could not have been, at the time of the meetings, a co-conspirator of

Orcutt or Mulligan, so his actions cannot subject them to long-arm
jurisdiction in New York under CPLR 302(a)(2).

And because there is no evidence of conversations before Allen's
meetings, there is no factual basis to find that Allen, "acting in New
York[,] acted 'at the direction or under the control,' or 'at the
request of or on behalf of' [Orcutt or Mulligan]." Dixon, 507 F. Supp.
at 350. Therefore, even assuming arguendo that Allen had conspired
with others before the New York meetings to move his team to Applied,
there is no factual basis to conclude that either Orcutt or Mulligan
was a member of the conspiracy.

Accordingly, CPLR 302(a)(2) does not provide the Court with long-
arm jurisdiction over either Orcutt or Mulligan.

### 2. CPLR 302(a)(1)

A non-domiciliary may be subject to personal jurisdiction under
CPLR § 302(a)(1) where an agent under her control "transacted any
business within" New York. New Media Holding Co. LLC v. Kagalovsky,
97 A.D.3d 463, 464 (1st Dep't 2012). QBE argues that this feature of
CPLR 302(a)(1) authorizes jurisdiction via the acts of a co-
conspirator, just as with CPLR 302(a)(2), where tortious acts by a co-
conspirator are a well-recognized basis for personal jurisdiction. See
supra § I(A). And Orcutt and Mulligan's briefs also seem to assume
that conspiracy may be a basis for CPLR 302(a)(1) jurisdiction. But
after carefully reviewing the cases cited by both sides, the Court
concludes that none stands for the proposition that a co-conspirator's
allegedly tortious acts in New York can establish a basis for personal

jurisdiction under § 302(a)(1). Rather, CPLR 302(a)(1) requires an agency relationship, even if not "a formal agency relationship," in which the purported agent "acted purposely in New York for [the defendant's] benefit and with [her] knowledge and consent, and that defendant[] ... exercised some control over the other[s] ... in the matter." New Media Holding Co., 97 A.D.3d at 464. It makes sense that civil conspiracy, a creature of tort law, could form a basis for CPLR 302(a)(2) jurisdiction, since that subsection concerns tortious acts in New York, whereas civil conspiracy would not establish jurisdiction under CPLR 302(a)(1), since that subsection concerns business transactions within the state.

Absent the conspiracy theory, QBE offers no discernible basis for § 302(a)(1) jurisdiction. "[P]roof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted" Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467 (1988). But there is no factual basis for asserting a "substantial relationship" between any action taken in New York by either Orcutt or Mulligan herself, since their only work-related trips to New York were at other times and wholly unrelated to anything at issue in this case. See Orcutt MTD Decl. ¶ 10; Mulligan MTD Decl. ¶ 8. Nor has QBE established that Allen acted on either Orcutt or Mulligan's behalf and under their control. See Orcutt ECF 26 ("MTD Reply") at 5 (collecting cases on requirement to allege specific facts regarding

the nature of the control exerted in the agency relationship). Not only is a qualifying agency relationship wholly unsupported by the facts discussed above, but the assertion that Allen was operating as Orcutt and Mulligan's agent in the New York meeting stands in stark tension with QBE's overall allegation that Allen orchestrated the aviation group's departure from QBE to Applied.

Accordingly, CPLR 302(a)(1) does not confer jurisdiction over either Orcutt or Mulligan.

### 3. CPLR 302(a)(3)(ii)

QBE also argues that the Court has jurisdiction under CPLR 302(a)(3)(ii), which provides long-arm jurisdiction over a defendant who "commits a tortious act without the state causing injury to person or property within the state [and] ... expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." QBE argues it has satisfied this provision with respect to Orcutt and Mulligan because they acted in Arizona and Georgia to email themselves confidential documents in violation of their confidentiality obligations and duty of loyalty to QBE (allegedly tortious acts), and thereby caused injury to QBE in New York. See Orcutt ECF 23 ("QBE MTD Opp.") at 11. The critical question is whether Orcutt and Mulligan expected or should have expected emailing themselves QBE documents to have injured QBE in New York.

The Second Circuit has held, in an unfair competition case under New York law in which the plaintiff is a national corporation, that

the situs of the injury for jurisdictional purposes should be "[t]he place where the plaintiff lost business," which "would normally be a forum reasonably foreseeable by a tortfeasor and it would usually be the place where the critical events associated with the dispute took place." Am. Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp., 439 F.2d 428, 433 (2d Cir. 1971).

The specific injury that QBE asserts is the risk to Applied of losing some of the 92 aviation policyholders that are based in New York. See QBE MTD Opp. 12; 3d Gransbury Decl. Orcutt ECF 24 ¶ 4. QBE argues that the Applied team is now using its confidential business information to unfairly compete for QBE clients. QBE submitted affidavits stating that Allen, Dekker, and three other former QBE employees met on Applied's behalf with Marsh USA, which serves as a broker for five of QBE's New York policyholders, 3d Gransbury Decl. ¶ 4, to discuss business opportunities. Ex. 1 to Declaration of Pietro A. Deserio, Orcutt ECF 25 ("Deserio MTD Decl.") at 4–5. QBE further argues that "[u]pon information and belief" that Applied was using QBE information in its presentation to Marsh and that the meeting involved a discussion regarding a "whole Marsh book" of business approach, in which Applied would underwrite all the policies brokered by Marsh. QBE MTD Opp. 13; Ex. 2. to Deserio MTD Decl.

But the Court concludes that QBE's asserted New York injury is too speculative, because it relies solely on a pitch meeting and the potential for future loss of New York business to result. Nor would Orcutt or Mulligan reasonably expect that their violations of

confidentiality in Arizona and Georgia would specifically harm QBE in New York. First, neither Orcutt nor Mulligan would reasonably expect effects in New York, because neither has been responsible for New York business at either QBE or Applied; Orcutt covers the west coast market, and Mulligan covers the south-east market, neither of which includes New York. See Orcutt MTD Decl. ¶ 8; Mulligan MTD Decl. ¶ 8. Second, QBE's proposed causal chain is too attenuated, since the Marsh meetings were conducted months later, by other people, and using materials that neither Orcutt nor Mulligan seem to have prepared. MTD Reply 8.

The Court therefore finds that CPLR 302(a)(3)(ii) does not provide long-arm jurisdiction over either Orcutt or Mulligan.

Since QBE has failed to articulate a statutory basis for this Court to exercise specific personal jurisdiction over either Orcutt or Mulligan, and it is undisputed that neither woman is subject to general personal jurisdiction in New York, the Court concludes that it lacks personal jurisdiction over Orcutt and Mulligan on the claims asserted in QBE's complaint. The Court therefore grants Orcutt and Mulligan's motion to dismiss QBE's complaint against them under Rule 12(b)(2). However, the complaint remains effective against Applied, which is a New York-headquartered company and did not join in Orcutt and Mulligan's motion.

## II.  **Preliminary Injunction**

QBE has moved in both the Allen and Orcutt actions for preliminary injunctions, and the Court directed the parties to brief and argue both motions together.

In the _Allen_ case, QBE is technically seeking an injunction in aid of arbitration, since it states that it is seeking to arbitrate a variety of claims against Allen and Dekker that arise under their written employment contracts, which contain arbitration clauses. _See_ Ex. A & B to 2d Gransbury Decl. § 7(i). Specifically, QBE asserts that it is seeking to arbitrate claims against Allen and Dekker sounding in breach of contract, for their alleged failures to abide by the restrictive covenants in their employment agreements, for misappropriation of confidential information, for breach of their duties of loyalty to QBE, and for unfair competition. However, since the Court concludes that QBE is likely to succeed on its breach of contract, misappropriation, and duty of loyalty claims, it is unnecessary to address the last two claims.

In the _Orcutt_ case, the only remaining defendant is Applied. _See_ _supra_ § I (dismissing claims against Orcutt and Mulligan for lack of personal jurisdiction). In its complaint, QBE asserts claims for misappropriation of confidential information, tortious interference with contract, and unfair competition. _Orcutt_ ECF 1-1 (complaint).

"A party seeking a preliminary injunction must ordinarily establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." _New York ex rel. Schneiderman v. Actavis PLC_, 787 F.3d 638,

650 (2d Cir. 2015). To obtain a preliminary injunction, a party need only demonstrate likelihood of success on one claim against each defendant. See 725 Eatery Corp. v. City of New York, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019).

For the reasons set forth below, the Court concludes that QBE is likely to succeed on several claims against Allen, Dekker, and Applied, and that it satisfies the other prerequisites for preliminary injunctive relief. Indeed, there was no dispute at the hearing that QBE was entitled to injunctive relief to protect information that was properly confidential. See Tr. 60-61.

**A. Likelihood of Success**

The Court begins with the likelihood of success prong, addressing in turn each of QBE's claims against Allen, Dekker, and Applied. We begin with QBE's common law claim for misappropriation of confidential information, since that issue lies at the core of most of the other claims on which QBE has an apparent likelihood of success.

   1. Misappropriation of Confidential Information (Allen, Dekker, Applied)

Under New York law, a trade secrets misappropriation claim requires the plaintiff to prove "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means. In re Document Techs. Litig., 275 F. Supp. 3d 454, 461-462 (S.D.N.Y. 2017) (citing N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43-44 (2d Cir. 1999)). Allen and Applied

do not dispute that they possessed documents alleged by QBE to contain trade secret information. Rather, they contend that the information did not constitute trade secrets and that they did not use the information in breach of a confidential duty (Allen) or as a result of discovery by improper means (Applied). But for at least some of the categories of documents and information improperly taken from QBE, the Court concludes that QBE is likely to succeed on its claim for misappropriation of confidential information.

The crux of the matter is thus whether the information taken contained trade secrets and whether Applied used those confidential data to unfairly compete. New York courts typically consider the following factors to determine whether information is a trade secret:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Id. at 462.

QBE most forcefully asserts trade secrets protection over documents that Allen, Orcutt, and others emailed to themselves and then used at Applied that contain three categories of information. First, QBE focuses on documents reflecting operations and business strategies, particularly those underwriting strategies developed under

the heading of the "Large Loss Mitigation Plan" ("LLMP").[3] Second, QBE asserts trade secret protection over detailed financial data reflecting results and projections of the aviation division's performance. Third, QBE asserts protection over certain client lists, which include information on key contacts, client requirements, policy terms, and policy expiration dates. See Greenwich Mills v. Barrie House Coffee Co., 459 N.Y.S.2d 454, 459 (2d Dep't 1983).

The record reflects that Allen and his team have used the first two categories of information to develop business plans and pitch decks for the nascent Applied aviation insurance department's efforts to secure reinsurance. Specifically, Applied used data taken from QBE's proprietary documents to populate charts historical and projected losses by aviation insurance business segment and overall portfolio performance in a pitch deck prepared with the assistance of the reinsurance broker Aon Re. See PX-19 at 14.[4] Applied also included

---

[3] The LLMP was an underwriting strategy project undertaken by various QBE units, including the aviation division, actuarial, underwriting, and finance to understand the performance of the aviation insurance portfolio by determining the types of risks that were leading to very large claims and thus to a disproportionate amount of QBE's losses. The project, which analyzed thousands of claims, took "multiple stakeholders" and "thousands of hours" to complete and resulted in a set of seven high-level underwriting principles and various action items under those headings. Tr. 9-10. The parties dispute how much of the LLMP's conclusions QBE ultimately shared with brokers and others outside the company, but the Court finds it unnecessary to resolve that issue at this juncture.

[4] "PX-___" citations refer to QBE's exhibits admitted into evidence at the hearing, while "DX-___" citations refer to defendants/respondents' exhibits.

detailed information about the LLMP to demonstrate its underwriting team's strategy for limiting the large losses that disproportionately affect carrier losses and for which reinsurance coverage is most important. Id. at 15-16. The pitch deck, which was ultimately shown to the one reinsurance carrier with which Applied has thus far been able to contract, Tr. 150-151, nowhere indicates that these data reflect the performance of Applied's competitor, QBE, not Applied itself. Indeed, Allen sent his team an email flagging precisely this issue while the team was drafting the pitch deck. See PX-17 at 1-2.

While defendants-respondents argue that these data were available in various public reports, regulatory filings, financial disclosures, and via interactions with insurance brokers, the Court finds that argument unavailing: Allen, Dekker, and Applied did not establish that these financial data about the performance of QBE's aviation insurance portfolio are publicly available through any source or combination of sources. Nor did defendants-respondents discredit the testimony from QBE's two witnesses, which established the strategic value and competitive sensitivity of this information, particularly in the context of an insurer's acquisition of reinsurance coverage, and the efforts that QBE undertakes to protect these data, even within the company. QBE has adduced credible evidence about these data to support each of the six factors set forth above that New York courts consider in adjudicating trade secret claims. The Court therefore holds that QBE is likely to succeed in proving that these financial data amounted to trade secrets.

It is a closer question whether the LLMP information contained in the reinsurance pitch deck amounted to a trade secret, since the record reflects that at least some of the information QBE gleaned from the LLMP was shared with brokers and other industry players. See, e.g., Tr. 109-110. But since QBE is likely to succeed in proving Allen and Applied's misappropriation of the historical and projected financial performance of QBE's aviation insurance portfolio, the Court need not now resolve whether QBE is also likely to succeed in proving that the LLMP information was tortiously misappropriated. Nor must the Court now decide whether QBE's misappropriation claim would likely succeed with respect to Allen, Dekker, and Applied's use of the QBE customer lists, which they have allegedly used to target QBE policyholders and undercut QBE on policy terms.

2.  Breach of Contract (Allen, Dekker)

QBE has filed arbitration claims against Allen and Dekker for breach of various restrictive covenants contained in their employment contracts. Specifically, QBE seeks to enforce restrictive covenants concerning confidentiality of QBE documents and trade secrets, non-solicitation of QBE policyholders, and non-solicitation of other QBE employees, as well as a provision requiring 90-day notice before departure from the company. For the reasons explained below, the Court concludes that QBE is likely to succeed on these claims, at least in part.

New York courts "carefully scrutinize[]" but ultimately enforce employment agreements' restrictive covenants not to compete under a

common-law standard of reasonableness. BDO Seidman v. Hirshberg, 93
N.Y.2d 382, 388 (1999). "A restraint is reasonable only if it: (1)
is *no greater* than is required for the protection of the *legitimate
interest* of the employer, (2) does not impose undue hardship on the
employee, and (3) is not injurious to the public." Id. at 388-389.
Specific enforcement is only available to the extent "it is reasonable
in time and area, necessary to protect the employer's legitimate
interests, not harmful to the general public and not unreasonably
burdensome to the employee." Id. at 389.

The first factor, including the cognizable employer's interests,
has been limited to "to the protection against misappropriation of the
employer's trade secrets or of confidential customer lists, ...
protection from competition by a former employee whose services are
unique or extraordinary," or protection against misappropriation of
goodwill properly belonging to the employer. Id. As the Court of
Appeals elaborated in BDO Seidman,

> [T]he legitimate purpose of an employer in connection with
> employee restraints is to prevent competitive use, for a time,
> of information or relationships which pertain peculiarly to the
> employer and which the employee acquired in the course of the
> employment. Protection of customer relationships the employee
> acquired in the course of employment may indeed be a legitimate
> interest.... The employer has a legitimate interest in preventing
> former employees from exploiting or appropriating the goodwill
> of a client or customer, which had been created and maintained
> at the employer's expense, to the employer's competitive
> detriment.

Id. at 391-392.

This reasonableness standard governs the enforceability of each
of the three restrictive covenants discussed below, concerning

confidentiality of trade secrets, non-solicitation of employees, and non-solicitation of customers.

### a. Confidentiality

New York law recognizes that an employer may enforce restrictive covenants designed to protect its confidential information. See BDO Seidman, 93 N.Y.3d at 389. Allen and Dekker both had expansive confidentiality provisions in their written employment agreements at QBE. See 2d Gransbury Decl. ¶ 23. Allen, at least, concedes that he disclosed several QBE documents by emailing them to his personal email address and then, in November 2021, to his new email address at Applied. See, e.g., PX-14, PX-15; Tr. 57. While Allen disputes that these documents contained confidential trade secrets, the Court finds, for reasons explained above, that certain financial data in the QBE documents were not publicly available and so should have been maintained in confidence. See supra § II.A.1 (analyzing claim for misappropriation of confidential information). QBE is therefore likely to succeed in proving in that Allen breached his contractual duty to maintain QBE's trade secrets in confidence.

QBE does not, however, allege that Dekker emailed QBE's confidential information to himself. See generally Allen ECF 1-1 (petition). Accordingly, the Court finds that QBE is not likely to succeed on this claim against Dekker.

### b. 90-Day Notice

Allen and Dekker concede that their employment contracts required that they provide 90-day notice before leaving QBE. See 2d Gransbury

Decl. ¶ 26 ("The Employee may terminate this Agreement and his employment by providing at least 90 days' advance notice to the Company."). The Court concludes that QBE will likely succeed in proving that Allen and Dekker breached this covenant.

Allen and Dekker both resigned on September 20, 2021. 2d Gransbury Decl. ¶ 12. QBE argues that their employment contracts therefore obliged them to remain QBE employees through December 19, 2021. Id. However, QBE terminated Allen and Dekker's access to QBE's systems as of October 1, 2021, by which time they had already returned their QBE computer equipment and had exit interviews. Tr. 120. Nonetheless, the record reflects that through December 2021, Allen continued to receive (though not deposit or accept) payments from QBE's payroll and to receive (and, apparently, to use) health insurance paid for by QBE.[5] Tr. 158-159. QBE also repeatedly reminded Allen and Dekker of their contractual obligation to provide 90-day notice to QBE before departure. Nonetheless, Allen and Dekker admit to having started work at Applied at least as early as November 1, 2021, which is less than 90 days after their resignations. Tr. 120-121.

Allen insists that QBE was "on notice since October 4, 2021 that [he] did not consider himself to be an employee of QBE nor did QBE treat him as such," but he does not explain what legal significance

---

[5] Allen avers that he has offered, through counsel, to reimburse QBE for costs it incurred in connection to any of his benefits during this period, though QBE has apparently not accepted this offer. See Declaration of Steven Allen, Allen ECF 23 ¶ 27.

this alleged notice has to QBE's claim. <u>Allen</u> <u>ECF</u> 22("PI Opp.") at 24. Allen and Dekker also suggest, without any authority, that the contractual terms improperly restricted their freedom of employment, though they do not go so far as to argue that the contract terms are invalid. <u>See</u> PI Opp. at 22 n. 7.

The Court therefore concludes that QBE is likely to succeed in its claim that Allen and Dekker violated the 90-day notice provisions of their employment contracts.

c. <u>Non-Solicitation of QBE Employees</u>

Allen and Dekker's employment agreements included broadly worded provisions prohibiting direct or indirect solicitation of QBE employees or enticing or attempting to persuade QBE employees to leave employment with QBE. ECF 19-1 at 4.[6] The same common law reasonableness

---

[6] The employee non-solicitation provisions stated:

The Employee agrees that during the Employee's employment with the Company and for 12 months following a termination of employment that occurs for any reason, the Employee will not:

i.    recruit, hire, or attempt to recruit or hire, directly or by assisting others, any then- current employee of the Company for employment with an entity other than the Company; or

ii.    entice or attempt to persuade the Company's then-current employees to leave employment with the Company.

For purposes of this Section [], "solicit" means any direct or indirect communication of any kind, regardless of who initiates it, that in any way invites, advises, encourages or requests any person to take or refrain from taking any action.

2d Gransbury Decl. ¶ 25.

standard from BDO Seidman set forth above applies to this restrictive covenant. See In re Document Techs. Litig., 275 F. Supp. 3d at 466.

In re Document Techs. Litig. addressed at length the question of whether an employer may enforce a restrictive covenant governed by New York law that purports to prohibit an employee or ex-employee from soliciting the company's other employees to follow him to a rival. Id. at 467-468. In that case, this Court held that a "restrictive covenant is ... unenforceable insofar as it purports to prohibit at-will employees, who have yet to accept an offer of new employment, from 'inducing' or even 'encouraging' their coworkers to leave their present employer." Id. The Court further concluded that "although [the employer] contends that the covenant prevents the potential harm to a company's operations arising from the coordinated en masse resignation of several employees, this is not a legally cognizable interest for the purposes of a restrictive covenant. The legitimate interest of the employer must protect against unfair competition, not simply to avoid competition in a general sense," and there is nothing unfair about coordinated departures or workers "market[ing] themselves as a 'package deal.'" Id. at 466-467. Since these restrictive covenants do not protect an employer's legally cognizable interests, the Court concluded that enforcement would be fundamentally unfair and would unduly inhibit labor market competition:

> [I]f [an employer] desires to prevent its employees from coordinating their resignations, it is free to hire them pursuant to term employment agreements. [The employer], however, cannot use restrictive covenants to supply itself all the benefits of term agreements while simultaneously retaining the right to lay

off its personnel whenever it so desires. This is not a proper purpose for such a restraint on free market competition."

Id. at 467.

It is true that New York state courts have recognized that breach of an employee non-solicitation clause may be a viable claim. See, e.g., Tender Loving Care v. Franzese, 517 N.Y.S.2d 50 (2d Dep't 1987). But these covenants' enforceability plainly depends on whether the clause at issue protects cognizable employer interests. QBE argues that the employees who left for Applied are skilled and experienced, and QBE cites another case from this District, Natsource LLC v. Paribello, for the proposition that these covenants may be enforceable under New York law where recruitment would irreparably harm the employer by leading to "loss of training and interference with already established relationships that would occur should [an ex-employee] recruit other employees within the year," because those employees "are unquantifiable assets" of the company. 151 F.Supp. 2d 465, 469 (S.D.N.Y. 2001). But QBE does not articulate any special investments that it has made in these employees' skills, nor how their continued employment is an "asset" when the company declined to secure their continued services through employment agreements of fixed terms. Indeed, New York courts have repeatedly held that that insurance brokers and agents do not provide "unique or extraordinary" services that might entitle an employer to greater protection from restrictive covenants. BDO Seidman, 93 N.Y.2d at 389; see, e.g., Riedman Corp. v.

<u>Gallager</u>, 48 A.D.3d 1188, 1189 (4th Dep't 2008); <u>Brewster-Allen-Wichert, Inc. v. Kiepler</u>, 131 A.D.2d 620, 620 (2d Dep't 1987).

Accordingly, the Court reaffirms its legal analysis from <u>In re Document Techs. Litig.</u> and concludes that it applies to Allen and Dekker's employment agreements with equal force. Accordingly, the Court holds that QBE is not likely to succeed on its claim that Allen breached his employment agreement by assisting Applied in its effort to recruit the other twelve QBE aviation insurance employees. <u>See, e.g.</u>, Tr. Tr. 131-132 (discussing interaction with a recruiter working on Applied's behalf), Tr. 137-138 (discussing communications with Orcutt about a recruiter's possible call).

### d. <u>Non-Solicitation of Policyholders</u>

Apparently seeking to severely limit Allen and Dekker's ability to compete with QBE after leaving the company, QBE inserted an overbroad restrictive covenant into their employment contracts:

> The Employee agrees that during the Employee's employment with the Company and for 12 months following a termination of employment that occurs for any reason, the Employee will not solicit any broker, agent or policyholder of the Company on behalf of the Employee or any other person, firm, company, or organization, either directly or indirectly, for the purpose of soliciting or obtaining insurance business or any account that was business or an account of the Company's during the 12 months prior to the Employee's termination of employment from the Company. The Employee further agrees that during the Employee's employment with the Company and for 12 months following a termination of employment that occurs for any reason, the Employee shall not contact any broker, agent or policyholder of the Company to discourage such entity or individual from doing business with Company, nor accept any business or account from any broker, agent, or policyholder that was business or an account of Company's during the 12 months prior to the Employee's termination of employment from the Company. For the avoidance of doubt, nothing in this paragraph shall be construed to prohibit Employee

from soliciting any broker, agent, or policyholder for insurance business or accounts that were not Company business or accounts in the 12 months prior to the Employee's termination of employment from the Company.

2d Gransbury Decl. ¶ 24.

In its pre-hearing specification of the injunctive relief requested, QBE impliedly concedes that much of this non-compete covenant is unenforceable. See ECF 37 ("JPTO") at 7-8. For instance, QBE seeks only to prevent solicitation of QBE policyholders, thereby conceding that it would be unenforceable as to brokers and agents. QBE's request is also limited to QBE aviation insurance policyholders, which is the only market relevant to Allen and Dekker's employment. And, in apparent recognition of the undisputed testimony establishing that QBE has implemented certain underwriting policies that had the effect of preventing it from renewing certain insurance policies previously underwritten by its aviation insurance division, QBE only requests that the covenant reach any client "who remains an active policyholder of QBE as of the date the injunction issues, with which QBE will seek to renew its policy."[7] JPTO 7-8.

---

[7] Allen has described various policies that QBE enacted that effectively precluded renewal of certain policies written by the aviation division. For instance, it reduced the acceptable risk limits for certain policies from $250 million to $100 million, restricting QBE's ability to write insurance policies for airports, airlines, aerospace products liability, and governmental entities. See Allen Decl. ¶ 16. QBE's policies also limited the group's ability to insure planes with more than 100 seats, air frame manufacturers, powerplant (i.e., engines) manufacturers, and pilots older than 70. Id. ¶ 17-18; Tr. 110.

Notwithstanding this overbreadth, QBE asserts that it is likely to succeed in enforcing the prohibition on Allen and Dekker soliciting active aviation insurance clients with policies that QBE seeks to renew. The Court agrees.

QBE's most forceful argument is that Allen, Dekker, and their team took confidential QBE documents with them to Applied and have been using the trade secret information within those documents to jumpstart Applied's ability to compete with QBE in the aviation insurance market. As explained above, the Applied team misappropriated QBE's confidential data on its loss history by segment, its projected financial performance, and its business strategy for limiting large losses, and presented it to reinsurance carriers in a manner calculated to support its bid for reinsurance coverage. Allen directly supervised this work, even expressing concern in an email that his team was in a "somewhat precarious[] situation" because someone might "allege[] that [they] [we]re utilizing proprietary information gleaned from our time at another shop." PX-17 at 1-2. Acquiring reinsurance is crucial to a carrier such as Applied being able to competitively price insurance policies and thus to compete for policyholders. See Tr. 74-77. Therefore, the Court concludes that Applied's unauthorized use of QBE's financial data and LLMP strategy helped it secure the competitively significant reinsurance contract it currently has with Everest Re. See Tr. 150-151. The Court further concludes that Applied's access to this reinsurance coverage likely materially enhances its ability to compete with QBE and other aviation insurers.

However, QBE can only obtain specific enforcement of this non-solicitation covenant if "it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." BDO Seidman, 93 N.Y.2d at 389. In this respect, the Court concludes that QBE will likely show that this covenant is reasonable. Its one-year duration is well within the bounds of what New York courts routinely enforce.[8] While QBE requests that the one-year time run from December 19, 2021 (90 days after Allen and Dekker resigned), the Court concludes it is more appropriate to run the time from October 1, 2021, the last day that Allen and Dekker had access to QBE's computer network. And even though the covenant is not geographically limited, that is reasonable in light of the competitive dynamics in the nationwide market for aviation insurance in which QBE and Applied compete. Nor would enforcement of this constraint likely harm the public or cause undue hardship to Allen and Dekker, since QBE's aviation insurance business as a whole represents only 6-7% of the U.S. insurance market, 2d Gransbury Decl. ¶ 11, and the subset of clients affected by the

---

[8] See, e.g., Willis of New York, Inc. v. DeFelice, 299 A.D.2d 240, 241 (1st Dep't 2002) (affirming as reasonable enforcement of 2-year non-solicitation agreement for high-level insurance broker); Chernoff Diamond & Co. v. Fitzmaurice, Inc., 234 A.D.2d 200, 202 (1st Dep't 1996) (affirming enforcement of 2-year client non-solicitation provision); see also Gundermann & Gundermann Ins. v. Brassill, 46 A.D.3d 615, 616 (2d Dep't 2007) (affirming enforcement of 18-month restriction). QBE's argument that the covenant is effectively longer because of the annual renewal cycles in this industry is unavailing.

enforceable portion of the covenant would be off-limits to Applied for less than a year.

The Court therefore holds that QBE likely will succeed in obtaining enforcement of the covenant prohibiting solicitation of its policyholders. This follows because enforcing the covenant advances QBE's legitimate interest in preventing Applied from competing with prices that are influenced by reinsurance unfairly obtained in part through misappropriation of QBE's proprietary financial data.

However, Allen and Dekker argue that the non-solicitation covenant is unenforceable with respect to certain categories of QBE aviation policyholders: clients with whom they had prior relationships before they joined QBE, clients that they never personally serviced, and clients that choose on their own to move from QBE to Applied. For reasons explained further below, the Court concludes that Allen and Dekker are correct, at least to some extent, with respect to their prior relationships and clients that choose to move to Applied of their own accord, though QBE will likely prevail in enforcing the covenant to clients not personally serviced by Allen and Dekker.

First, Allen and Dekker are likely correct that the non-solicitation covenant is unenforceable with respect to certain clients with whom they had preexisting relationships before they arrived at QBE. This Court has previously held that a client non-solicitation provision in the insurance industry is overbroad where it fails to "exempt[] clients who came to [the employer] solely to avail themselves of [the employee's] services and only as a result of his own

independent recruitment efforts, which [the employer] neither subsidized nor otherwise financially supported as part of a program of client development." Marsh USA Inc. v. Schuhriemen, 183 F. Supp. 3d 529, 535 (S.D.N.Y. 2016), amended, 2016 WL 2731588 (S.D.N.Y. May 3, 2016).[9] QBE acknowledges this legal rule but argues that it is inapposite in the aviation insurance business, because, QBE argues, aviation insurance business does not follow individual underwriters or executives but depends instead on the financial resources of the underwriting insurer. See, e.g., Allen ECF 17 ("PI Mot.") 6; Allen ECF 30 ("PI Reply") 7-8; 1st Gransbury Decl. ¶ 4.

Allen and Dekker each claim to have independent client relationships that they brought to QBE. Dekker, who spent 25 years in aviation insurance at AIG (and had other pertinent experience before that, including as a broker), states that much of the business is based on "peer-to-peer relationship built between people like myself and the brokers who essentially run the insurance business for the

---

[9] See BDO Seidman, 93 N.Y.2d at 393 ("[I]t would be unreasonable to extend the covenant [not to compete] to personal clients of defendant who came to the firm solely to avail themselves of his services and only as a result of his own independent recruitment efforts, which [employer] neither subsidized nor otherwise financially supported as part of a program of client development. Because the goodwill of those clients was not acquired through the expenditure of [employer]'s resources, the firm has no legitimate interest in preventing defendant from competing for their patronage. Indeed, enforcement of the restrictive covenant as to defendant's personal clients would permit [employer] to appropriate goodwill created and maintained through defendant's efforts, essentially turning on its head the principal justification to uphold any employee agreement not to compete based on protection of customer or client relationships.").

policyholders."[10] Declaration of Gregory Dekker, <u>Allen</u> ECF 24 ¶¶ 4-6. Dekker lists various clients with whom he claims to have relationships that pre-date his time at QBE. For some clients, Dekker claims to have substantially increased QBE's portion of the client's business, while acknowledging that QBE had a relationship before his arrival.[11] As to these clients (and those similarly situated) Dekker's claim under <u>BDO Seidman</u> is weak, since even on his telling, those clients did not "c[o]me to the firm solely to avail themselves of [Dekker's] services and only as a result of his own independent recruitment efforts." 93 N.Y.2d at 393. Dekker admits that QBE had preexisting relationships with these clients, and his assertion to have increased the business coming QBE's way does not establish that these clients came to QBE "solely to avail themselves" of Dekker's services. <u>Marsh USA</u>, 183 F. Supp. 3d, at 535.

But Dekker attests that there are other clients who followed him from AIG to QBE or otherwise started their relationships with QBE under Dekker's influence.[12] QBE has not disputed the nature of Dekker's

---

[10] This statement tends to undermine Allen, and Dekker's legal position, because Dekker attests that the key relationships he brought to QBE are with <u>brokers</u>, not policyholders, Dekker Decl. ¶ 4-6, and QBE is not seeking to enforce the non-solicitation provision with respect to brokers

[11] <u>E.g.</u>, Million Air, AAR, Port Authority of NY/NJ, DynCorp, Atlantic Aviation, Sands Casino, Hendricks Motor Sports, etc. Dekker Decl. ¶ 8.

[12] According to Dekker's declaration, these preexisting clients include: Wheels Up, Columbia Air Service, Jetsmart, Jim Loomis / J&J, Vee Neal Aviation, Enhancement of Illinois, and Broken Pick Ranch. <u>See</u> Dekker Decl. ¶ 8. Allen makes general claims to have such

relationship with these few preexisting clients. For these policyholders, Dekker has a stronger, likely winning, argument that it would be unreasonable to enforce QBE's restrictive covenant to prevent Dekker's solicitation of them. Therefore, the Court holds that the non-solicitation covenant is likely unenforceable as to that limited set of Dekker's preexisting clients.

Second, Allen and Dekker argue that that the non-solicitation provision is overbroad because it would prevent Applied from doing business with many of the 3,100 QBE aviation insurance policyholders that they never personally serviced. This contention is grounded in BDO Seidman, which held that "[e]xtending the anti-competitive covenant to BDO's clients with whom a relationship with defendant did not develop through assignments to perform direct, substantive accounting services would ... constitute a restraint greater than is needed to protect [the firm's] legitimate interests," and so it violates the first prong of the common law reasonableness standard. 93 N.Y.2d at 392. However, Allen and Dekker fail to grapple with the Court of Appeals' footnote to that holding, a distinction that applies to this case: "A different result might obtain had BDO submitted any proof that defendant had used confidential firm information to attract BDO clients with whom he had not had a relationship while employed there." Id. at 392 n. 2. Here, the core unfairness in Applied's

---

relationships, his declaration does not identify them, so there are no clients to carve out on that basis. See Allen Decl. ¶ 9.

competition for QBE's policyholders is that Applied's pricing depends in part on reinsurance it obtained using proprietary information misappropriated from QBE. Therefore, the Court holds that QBE is likely to prove that there is no rationale for carving out from enforcement of the non-solicitation provision those clients that Allen and Dekker did not personally service.

Third, Allen and Dekker argue that the non-solicitation provision is overbroad because it would prohibit them from servicing any policyholder that voluntarily decides to contact Applied for aviation insurance. PI Opp. 14-15. Courts have imposed this limitation on non-solicitation in the past. For instance, in Leon M. Reimer & Co., P.C. v. Cipolla, Judge Barrington D. Parker Jr. held that enforcing such a provision would be unreasonable because it would prohibit a competitor from servicing "a client who voluntarily and without any prior solicitation by [ex-employee] contacts him and seeks to retain him... [which would] prohibit[] considerably more than the active solicitation or diversion of clients." 929 F. Supp. 154, 158 (S.D.N.Y. 1996). See also Deloitte & Touche, LLP v. Chiampou, 222 A.D.2d 1026 (4th Dep't 1995). The Court agrees and holds that QBE will not likely succeed in enforcing the covenant insofar as it would prohibit Allen and Dekker from servicing clients that move to Applied of their own initiative.

In sum, the Court concludes that QBE will likely succeed in proving that a portion of the policyholder non-solicitation covenant is enforceable, provided that the numerous aspects of overbreadth

discussed above are carved out. And there is no question that the Court would be authorized to "blue pencil" the covenant to enforce only those portions that protect a legitimate business interest. See BDO Seidman, 93 N.Y.2d at 394 ("[I]f the employer demonstrates an absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct, but has in good faith sought to protect a legitimate business interest, consistent with reasonable standards of fair dealing, partial enforcement may be justified."). Since there is no evidence that QBE overreached or coercively used market power in negotiating Allen and Dekker's employment agreements, the Court concludes that exercising that QBE will likely prevail in obtaining partial enforcement of the restrictive covenant.

Since the client non-solicitation provision is enforceable, at least in part, the final question is whether Allen and Dekker breached it. QBE contends that Allen and Dekker have already breached the provision prohibiting solicitation of policyholders by "directly and indirectly soliciting and servicing QBE policyholders." PI Mot. 14-15. QBE provides several declarations suggesting that the Applied team has sought to compete for relationships with QBE policyholders and their brokers. See, e.g., 2d Gransbury Decl. ¶ 88; Declaration of Kathryn Rouker, Allen ECF 21 ¶¶ 4, 7. Allen and Dekker rightly point out that this multiple-hearsay evidence is weak at best. But that objection is ultimately of little effect, and the Court need not decide whether breaches have already occurred. That is because the Second Circuit has held in a similar case in which plaintiffs were seeking a

36

preliminary injunction to enforce a restrictive covenant that "if a defendant's solicitation followed a physical taking or studied copying, the court may in a proper case enjoin solicitation, not necessarily as a violation of a trade secret, but as an egregious breach of trust and confidence while in plaintiffs' service." N. Atl. Instruments, Inc., 188 F.3d at 47. Since Applied's unfair competition is ultimately traceable to a physical taking of QBE documents containing trade secrets, this rule suffices to establish QBE's likelihood of success and thus its entitlement to injunctive relief.

3. Breach of Duty of Loyalty (Allen, Dekker)

QBE alleges that Allen and Dekker breached their duties of loyalty by misappropriating confidential documents, and that Allen further breached the duty of loyalty by meeting surreptitiously with Applied while working for QBE and in the process misusing QBE's confidential information and expense account. ABKCO Music, Inc. v. Harrisongs Music, Ltd., 722 F.2d 988, 994 (2d Cir. 1983). ("[A]n agent has a duty not to use confidential knowledge acquired in his employment in competition with his principal."). QBE also alleges that Allen and Dekker breached their duties of loyalty by beginning to work for Applied while still within their 90-day departure windows.

For the same reasons discussed above, the Court concludes that QBE is likely to succeed on its claims against Allen and Dekker for breaching their duties of loyalty.

**B. <u>Irreparable Harm and the Public Interest</u>**

QBE argues that will suffer irreparable harm if a rival insurer is able to set up a competing aviation insurance division using its former employees and its trade secrets, passing off QBE's financial results as its own. The Court agrees. Even if QBE could reliably measure and obtain damages for poached customers at the end of this litigation, it would be very difficult to precisely quantify the harm caused by having its trade secrets misappropriated and used to jump-start a new competitor. <u>See</u> <u>Crown IT Servs. v. Koval-Olsen</u>, 11 A.D.3d 263, 266 (1st Dep't 2004). And, although it is not dispositive, Allen and Dekker's employment contracts agree that a breach of the relevant restrictive covenants would constitute irreparable harm. 2d Gransbury Decl. Ex A & B § 6(g). The Court therefore concludes that QBE has established that it will suffer irreparable harm absent preliminary injunctive relief.

Finally, the Court concludes that granting an injunction will not disserve the public interest. There will be no meaningful harm from enforcing the stripped-down restrictive covenants. QBE's share of the aviation insurance market is limited, and Applied's ability to compete over the one-year term of the covenants is already limited because of its regulatory restrictions. <u>See, e.g.</u>, Tr. 122.

Therefore, the Court grants QBE's motions for a preliminary injunction.

## C. Bond

Allen, Dekker, and Applied seek a combined $1 million bond for a preliminary injunction, arguing that they will be harmed if wrongly prevented from soliciting business from QBE clients and using certain preexisting relationships. QBE requests no bond or alternatively that the Court shift the $20,000 aggregate bond from the TRO. QBE argues, and the Court agrees, that shifting the existing bond would be appropriate since there is no doubt that QBE could pay any subsequent judgment if Applied later obtains a judgment for damages resulting from inappropriate injunctive relief.

## III.   Conclusion

For the reasons set forth above, the Court grants Orcutt and Mulligan's motion to dismiss QBE's complaint against them, because there is no statutory basis for this Court to exercise personal jurisdiction over them. This leaves Allen, Dekker, and Applied in the two cases.

As to these remaining parties, the Court grants in part and denies in part QBE's motions for preliminary injunctions, which will be identical in each action.

First, Allen, Dekker, and Applied will be enjoined from possessing any documents containing alleged trade secret information generated by QBE's aviation division that were taken from QBE by any former QBE aviation employee. Allen, Dekker, and Applied (including all Applied employees) will not use, disclose, or share with any person or entity

such documents, or any other QBE confidential information, in their possession. This relief is already contained in the TROs.

Second, Allen, Dekker, and Applied (including all Applied employees) shall not, from the date the preliminary injunction issues through the earlier of October 1, 2022 or the end of this litigation, directly or indirectly through others (including through brokers/agents) either (i) solicit any Covered QBE Aviation Insurance Policyholder[13] whom or which has been a QBE policyholder since October 1, 2020, and who remains an active policyholder of QBE as of the date the injunction issues, or (ii) discourage any Covered QBE Aviation Insurance Policyholder from doing further business with QBE.

As Allen, Dekker, and Applied have argued, they cannot be expected to comply with the non-solicitation aspect of this preliminary injunction if it is phrased solely in the categorical terms used to analyze the restrictive covenant's enforceability. Indeed, Fed. R. Civ. P. 65(d)(1)(C) requires every injunction to "describe in reasonable detail -- and not by referring to the complaint or other document -- the act or acts restrained or required." Therefore, Counsel are directed to meet and confer and, within two weeks of the entry of this order, jointly submit a list of the Covered QBE Aviation Insurance Policyholders that fall within the non-solicitation covenant's likely enforceable scope, as set forth in section II.A.2.d, supra. That list,

---

[13] The term "Covered QBE Aviation Insurance Policyholder" shall incorporate by reference the schedule of qualifying QBE clients that the parties shall jointly prepare, as discussed further below.

which may be sealed if either party so-requests, will be incorporated
by reference to the preliminary injunction, which shall issue shortly
thereafter. Until that time, the TROs remain in effect.

    SO ORDERED.

New York, NY
March 24, 2022

                                  JED S. RAKOFF, U.S.D.J.